IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE No. 1:25-cv- 23652

JERREL KENEMORE;
REJEANA ANN TILLERY;
JERRELL LLOYD KENEMORE II;
TRISTAN ALEXANDER LEE KENEMORE;
TINA RACHEL PORRAS;
JASON SAAD;
EDGAR JOSE MARVAL
LADY STEPHANIE SCHULMAN MORRIS;
SMS a minor; and
MSM a minor;

       Plaintiffs,                              **JURY TRIAL
DEMANDED**

vs.

NICOLAS MADURO MOROS;
THE CARTEL OF THE SUNS A.K.A.
CARTEL DE LOS SOLES;
PETROLEOS DE VENEZUELA, S.A.
A.K.A. PDVSA;
CORPORACION VENEZOLANA DEL PETROLEO
A.K.A. CVP;
VLADIMIR PADRINO LOPEZ;
MAIKEL JOSE MORENO PEREZ;
NESTOR LUIS REVEROL TORRES;
TAREK WILLIAM SAAB;
JORGE JESUS RODRIGUEZ GOMEZ;
DELCY ELOINA RODRIGUEZ GOMEZ;
DIOSDADO CABELLO RONDÓN; and
ALEX NAIN SAAB MORAN;

       Defendants.

_____/

## TABLE OF CONTENTS

Page

COMPLAINT ........................................................................................................... 1

INTRODUCTION .................................................................................................... 1

PARTIES ................................................................................................................. 3

JURISDICTION AND VENUE ............................................................................... 10

FACTUAL ALLEGATIONS ................................................................................... 13

I.     MADURO'S TERORISM AGAINST U.S. CITIZENS, INCLUDING
THE PLAINTIFFS.......................................................................................... 13

     A.    Maduro's Illegitimate Authoritarian Control over Venezuela................ 13

     B.    Maduro's Anti-Americanism ................................................................ 17

     C.    Maduro's Narcoterrorism Against the U.S. Populace ............................ 17

     D.    Maduro's Kidnapping of U.S. Citizens For Political Gain,
Including To Barter U.S. Hostages for Venezuelan Criminals
Incarcerated In the United States ......................................................... 20

     E.    Maduro's Kidnapping and Torture of the Plaintiffs .............................. 22

           1.    Maduro Indiscriminately Snatches Innocent US Citizens to
Trade for Alex Saab, Who Was Awaiting Trial In Miami. ......... 22

           2.    Maduro's Playbook for the Defamation and Torture of His
Kidnapping Victims. ................................................................ 23

           3.    Kidnapping and Torture of Jerrel Kenemore (643 days)............. 26

           4.    Kidnapping and Torture of Edgar Marval (123 days) ................ 33

           5.    Kidnapping and Torture of Jason Saad (560 days). ..................... 36

II.    THE DEFENDANTS' TERORISM AGAINST THE PLAINTIFFS, DUE
TO THEIR PROVISION OF MATERIAL SUPPORT MADURO. ................... 39

     A.    The Cartel of the Suns............................................................................ 39

           1.    History of the Cartel.................................................................. 39

           (a)   The Cartel's Material Support for Maduro and His
Terrorism................................................................................ 40

           2.    Individual Defendants' Roles In Supporting The Cartel
And Providing Material Support To Maduro and His
Terrorism................................................................................ 41

     B.    PDVSA ................................................................................................ 44

           1.    Maduro's Control Over PDVSA.................................................. 44

# TABLE OF CONTENTS
### (continued)

Page

2.    PDVSA Provides Material Support To Maduro By Engaging in Narcotics Trafficking Into The United States. ........ 46

3.    PDVSA Provides Material Support To Maduro By Laundering To and Through the United States the Proceeds of Narcotics Trafficking................................................................ 47

4.    PDVSA Provides Material Support To Maduro By Laundering To and Through the United States the Proceeds of Currency Control Scams........................................................... 50

5.    PDVSA Provides Material Support To Maduro By Assisting Him To Commit Other Act of Terrorism Against the United States ................................................................... 52

6.    OFAC's Designation of PDVSA. ................................................. 53

C.    Corporacion Venezolana del Petroleo ..................................... 54

III.    THE MADURO CRIMINAL CONSPIRACY .................................... 57

IV.    THE MADURO RICO ENTERPRISE............................................... 59

COUNT I   Violation of the Federal Anti-Terrorism Act, 18 U.S.C. § 2333 ........................... 59

COUNT II   Violation of the Federal Anti-Terrorism Act, 18 U.S.C. § 2333............................ 65

COUNT III Violation of the Florida Anti-Terrorism Act, Fla. Stat. § 772.13 ............................ 70

COUNT IV Violation of the Florida Anti-Terrorism Act, Fla. Stat. § 772.13 ............................ 73

COUNT V Conspiracy........................................................................ 77

COUNT VI  Federal Civil RICO, 18 U.S.C. § 1964(c)................................................ 77

COUNT VII  Conspiracy to Violate Federal Civil RICO, 18 U.S.C. § 1962(d) ........................ 83

PRAYER FOR RELIEF ...................................................................... 84

## COMPLAINT

Plaintiffs Jerrel Kenemore, Jerrel Lloyd Kenemore II, Tristan Alexander Lee Kenemore, Zoe Athena Vera Lynn Kenemore, Tina Rachael Porras and Rejeana Ann Tillary (the "Kenemore Family"), Edgar Jose Marval, Lady Stephanie Schulman Morris, SMS a minor, MSM a minor (the "Marval Family") and Jason Saad bring this action for violations of the federal Anti-Terrorism Act, 18 U.S.C. § 2333 et seq (the "ATA"), the Florida Anti-Terrorism Act (the "Florida ATA"), and the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*. ("RICO") against Defendants Nicolas Maduro Moros ("Maduro"), the Cartel of the Suns aka Cartel de los Soles (the "Cartel"), Petroleos de Venezuela ("PDVSA"), Vladimir Padrino Lopez ("Padrino Lopez"), Maikel Jose Moreno Perez ("Moreno Perez"), Nestor Luis Reverol Torres ("Reverol"), Tarek William Saab ("Tarek Saab"), Jorge Jesus Rodriguez Gomez ("Jorge Rodriguez"), Delcy Eloina Rodriguez Gomes ("Delcy Rodriguez"), Diosdado Cabello Rondon ("Diosdado Cabello"), and Alex Nain Saab Moran ("Alex Saab"), and plead as follows:

## INTRODUCTION

1.      Maduro controls the illegitimate apparatus that runs Venezuela as a narco-state and kleptocracy. He commits flagrant acts of terrorism against U.S. citizens and has been indicted in federal court in New York for narcoterrorism against the entire U.S. populace.

2.      But Maduro cannot commit his acts of terrorism alone: the other Defendants provide him with material support, including a steady stream of incredibly lucrative narcotics proceeds, ongoing money laundering services, and assistance to evade U.S. sanctions. Money is the lifeblood of terrorism, and without the other Defendants' willing support, Maduro's terrorism against U.S. citizens (and the Venezuelan populace) would not be possible.

3.      That is why, when the United States captured and arrested one of Maduro's key insiders—Defendant Alex Saab—and held him in federal prison in Miami pending his trial for conspiracy to commit money laundering, Maduro responded with even more aggressive acts of anti-American terrorism. Specifically, Maduro began kidnapping U.S. citizens to trade for Alex Saab's release.

4.      Plaintiffs Jerrel Kenemore, Edgar Marval and Jason Saad were among those unfortunate enough to be caught in Maduro's indiscriminate net of hostage taking in the wake of Alex Saab's lawful capture and extradition to Miami, Florida. Maduro held Mr. Kenemore, Mr. Marval and Mr. Saad captive in unspeakably harsh conditions for almost two years, during which time Maduro was responsible for their torture at the hands of his secret police. To give just one example, sadistic beatings broke Mr. Marval's back, and he remains in constant agony and in need of strong painkillers to this very day.

5.      Eventually, the United States agreed to release Alex Saab in exchange for Maduro's agreement to release the Plaintiffs and other prisoners. Maduro saw that deal as a much needed win to ensure the continued and undivided loyalty of his underlings.

6.      All the while that Plaintiffs were being held as Maduro's captives, the other Defendants provided Maduro with unlawful material support—including, among other things, narcotics trafficking into the United States and money laundering to and through the United States—yielding billions of dollars extracted from U.S. citizens. That was money Maduro, who, having wrecked the Venezuela economy through his own incompetence and avarice, desperately needed. He needed cash to purchase loyalty in Venezuela, cement his illegitimate authoritarian control over Venezuela, and continue to commit anti-American terrorism, including keeping Plaintiffs as captives in his dungeons.

780222892.8

7.      Maduro's conduct—kidnapping U.S. citizens, torturing them, and using them as pawns to bargain with the U.S. government for the release of a Venezuelan criminal awaiting justice in Florida—is the epitome of terrorism. But so too is the very act (and crime) of providing Maduro with material support.

8.      Simply put, criminals, like the Defendants who enable Maduro, cannot use the United States with impunity as a "Barbary Coast" from which to fund and support Maduro's international terrorist operations. As courts in this judicial district have repeatedly recognized, providing material support to Maduro from within Florida gives rise to liability under, among other laws, the ATA and the Florida ATA. *See Albán v. Maduro*, 1:21-cv-20706 (S.D. Fla.), at ECF 56 (Report & Recommendation) ("Plaintiffs have plausibly alleged . . . two types of terrorism that injured Plaintiffs," the first of which was "narcoterrorism and related terror financing" that inured to Maduro's benefit), *adopted* at ECF No. 58; *Marrón v. Maduro,* 1:21-cv-23190, ECF No. 44 ("Defendants' violations of the Florida Anti-Terrorism Act - using narcotics sales in Florida to fund their acts of terrorism at home - gave rise to Mr. Marrón's injuries").

## **PARTIES**

9.      Edgar Jose Marval is a citizen of the United States residing in Miami, Florida.

10.     Lady Stephanie Schulman Morris is a citizen of the United States residing in Miami, Florida. She is Edgar Marval's wife.

11.     SMS, a minor, is a citizen of the United States residing in Miami, Florida. He is Edgar Marval's son.

12.     MSM, a minor, is a citizen of the United States residing in Miami, Florida. She is Edgar Marval's daughter.

13.     Plaintiff Jerrel Kenemore is a citizen of the United States residing in Rhome, Texas.

3

14.     Jerrel Lloyd Kenemore II is a citizen of the United States residing in Fort Worth, Texas. He is Jerrel Kenemore's son.

15.     Tristan Alexander Lee Kenemore is a citizen of the United States residing in the Norman, Oklahoma. He is Jerrel Kenemore's son.

16.     Zoe Athena Vera Lynn Kenemore is a citizen of the United States residing in Denton, Texas. She is Jerrel Kenemore's daughter.

17.     Tina Rachael Porras is a citizen of the United States residing in the Lewisville, Texas. She is Jerrel Kenemore's sister.

18.     Rejeana ("Jeana") Ann Tillary is a citizen of the United States residing in the Rhome, Texas. She is Jerrel Kenemore's sister.

19.     Jason Saad is a citizen of the United States residing in Alabama.

20.     Maduro is an authoritarian strongman who exercises dictatorial power over the country of Venezuela. The United States ceased to recognize him or his regime as the legitimate government of Venezuela no later than August 2017. Similarly, on July 31, 2017, the U.S. Department of Treasury, Office of Foreign Assets Control ("OFAC") sanctioned Maduro for "undermining democracy in Venezuela."[1] On March 26, 2020, the Department of Justice unsealed a criminal indictment against Maduro, still pending in the United States District Court for the Southern District of New York, for orchestrating a "corrupt and violent narco-terrorism conspiracy between the Venezuelan Cartel de Los Soles ('Cartel of the Suns') and the Fuerzas Armadas Revolucionarias de Colombia ('FARC')."[2] Maduro is a citizen and resident of Venezuela, where

---

[1] *See* Press Release, U.S. Dep't of the Treasury, *Treasury Sanctions the President of Venezuela*, ¶ 1, (July 31, 2017), https://www.treasury.gov/press-center/press-releases/pages/sm0137.aspx.

[2] *See* Maduro Indictment, ¶ 1, https://www.justice.gov/opa/page/file/1261806/download.

4

(although he has no recognized or lawful government position) he openly and notoriously controls the country, flouts U.S. authority, and remains a fugitive from justice. On August 7, 2025, the U.S. Department of State, through its Narcotics Rewards Program, increased the reward up to $50 million for information leading to the arrest and/or conviction of Maduro.[3]

21.    Defendant Cartel of the Suns (or Cartel de los Soles) is a Venezuelan drug-trafficking cartel; it operates as an unincorporated association based in Venezuela. Maduro—along with several others—controls the Cartel of the Suns. The DOJ has explained that "Maduro," including through his leadership of the Cartel, "expressly intended to flood the United States with cocaine in order to undermine the health and well-being of our nation."[4] On July 25, 2025, OFAC designated the Cartel as a Specially Designate Global Terrorist.[5] Several senior members of the Cartel of the Suns are incarcerated in prison in the United States, including: (1) Former Major General Cliver Alcala Cordones, a Cartel de los Soles leader who pleaded guilty to provision of material support to a foreign terrorist organization and transfer of firearms for use in a federal crime of terrorism,[6] and (2) Hugo Armando Carvajal Barrios aka "El Pollo," a cartel leader and

---

[3] *See* Press Release, U.S. Dep't of State, *Reward Offer Increase of Up to $50 Million for Information Leading to Arrest and/or Conviction of Nicolás Maduro* (Aug. 7, 2025), https://www.state.gov/reward-offer-increase-of-up-to-50-million-for-information-leading-to-arrest-and-or-conviction-of-nicolas-maduro.

[4] *See* Press Release, U.S. Dep't of Justice ("DOJ"), *Nicolás Maduro Moros and 14 Current and Former Venezuelan Officials Charged with Narco-Terrorism, Corruption, Drug Trafficking and Other Criminal Charges*, ¶ 3, (Mar. 26, 2020) ("DOJ Press Release"), https://www.justice.gov/opa/pr/nicol-s-maduro-moros-and-14-current-and-former-venezuelan-officials-charged-narco-terrorism.

[5] *See* Press Release, U.S. Dep't of Treasury, *Treasury Sanctions Venezuela Cartel Headed by Maduro* (July 25, 2025), https://home.treasury.gov/news/press-releases/sb0207.

[6] *United States v. Cliver Antonio Alcala Cordones*, 11-cr-205 (S.D.N.Y.), Dkt. 115 (Superseding Indictment); Dkt. 117 (transcript of guilty plea); Press Release, US DOJ, *Former Venezuelan General Sentences to 260 Months in Prison For Providing Material Support to the FARC* (April 8, 2024).

former director of Venezuela's military intelligence agency, who is incarcerated in federal prison pending the outcome of narcoterrorism charges against him.[7]

22.     Defendant PDVSA is a Venezuelan state-owned oil and natural gas company. On January 28, 2019, the US Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which implements US sanctions, imposed sanctions on PDVSA.[8] In designating PDVSA, OFAC explained that "PdVSA has long been a vehicle for corruption" and that "[t]oday's designation of PdVSA will help prevent further diverting of Maduro's assets by Maduro."

23.     Defendant Corporacion Venezolana del Petroleo ("CVP") is a wholly owned subsidiary of PDVSA. It manages and controls businesses that PDVSA maintains with third parties, both Venezuelan and non-Venezuelan. It serves as an important node of PDVSA's money laundering network.

24.     Defendant Vladimir Padrino Lopez is the *de facto* Minister of Defense of Venezuela. On September 25, 2018, OFAC imposed U.S. sanctions on Padrino Lopez, explaining that Padrino Lopez is "a member of [Maduro's] inner circle and lifelong member of the Venezuelan military," who Maduro installed "to help ensure the military's loyalty to the Maduro regime."[9] Padrino Lopez was indicted in the United States District Court for the District of

---

[7] *See* Press Release, DOJ, *Former Venezuelan Official Hugo Armando Carvajal Barrios Extradited To The United States On Narco-Terrorism, Firearms, And Drug Trafficking Charges,* (July 19, 2023), https://www.justice.gov/usao-sdny/pr/former-venezuelan-official-hugo-armando-carvajal-barrios-extradited-united-states.

[8] *See* Press Release, OFAC*, Treasury Sanctions Venezuela State-Owned Oil Company Petroleos de Venezuela, S.A.,* (Jan. 28, 2019), https://www.justice.gov/usao-sdny/pr/former-venezuelan-official-hugo-armando-carvajal-barrios-extradited-united-states.

[9] *See* Press Release, U.S. Dep't of the Treasury, *Treasury Targets Venezuela President Maduro's Inner Circle and Proceeds of Corruption in the United States,* (Sept. 25, 2018), ¶ 5, https://home.treasury.gov/news/press-releases/sm495.

780222892.8

Colombia.[10] The indictment alleges that from March 2014 until May 2019, Padrino Lopez conspired with others to distribute cocaine using an aircraft registered in the United States. Padrino Lopez is a senior member of the Cartel of the Suns. Padrino Lopez is a citizen and resident of Venezuela, where he remains a fugitive from justice.

25.     Maikel Jose Moreno Perez is currently a Justice (formerly the Chief Justice) of the Venezuelan Supreme Court, a position he has held since February 2017. In May 2017, OFAC sanctioned him for "judicial rulings . . . that have usurped the authority of Venezuela's democratically-elected legislature."[11] He has been criminally charged in the United States District Court for the Southern District of Miami.[12] Those charges include conspiracy to commit money laundering and money laundering in connection with the corrupt receipt of millions of dollars of bribes—largely originating from accounts in South Florida—to illegally alter the outcome of dozens of civil and criminal cases in Venezuela. The U.S. State Department has offered a reward of $5 million for information leading to his arrest and/or conviction.[13] He is a citizen and resident of Venezuela, and a fugitive from justice.

26.     Defendant Nestor Luis Reverol Torres has held many government positions in Venezuela. He is currently the *de facto* Minister of People's Power for Interior Relations and

---

[10] *See* Indictment, *United States v. Vladimir Padrino Lopez,* 19-cr-176 (D.D.C. May 24, 2019), https://www.justice.gov/opa/page/file/1261721/download.

[11] *See* Press Release, U.S. Dep't of the Treasury, *Treasury Sanctions Eight Members of Venezuela's Supreme Court of Justice,* (May 18, 2017), ¶ 1, https://home.treasury.gov/news/press-releases/sm0090.

[12] *See* Criminal Complaint, *United States v. Moreno Perez,* 20-cr-2407 (S.D. Fla. March 12, 2020), https://www.justice.gov/opa/page/file/1261816/download.

[13] *See* Press Release, U.S. Dep't of State, *Transnational Organized Crime Rewards Program: Maikel Jose Moreno Perez,* (July 21, 2020), https://www.state.gov/inl-rewards-program/transnational-organized-crime-rewards-program/maikel-jose-moreno-perez/.

Justice. Ironically, he is the former general director of Venezuela's La Oficina Nacional Antidrogas ("ONA"), which is the Venezuelan government agency charged with fighting narcotics production and trafficking (its mission is similar to that of the Drug Enforcement Agency in the United States). On July 26, 2017, OFAC imposed sanctions on Reverol Torres for "undermining democracy" in Venezuela.[14] In 2016, the DOJ unsealed an indictment against Torres for offenses including trafficking and distributing cocaine.[15] Defendant Reverol Torres is a senior member of the Cartel of the Suns. He is a citizen and resident of Venezuela and a fugitive from justice.

27.     Defendant Tarek William Saab is the *de facto* Attorney General (sometimes called the Prosecutor General) of Venezuela. On July 26, 2017, OFAC sanctioned him for undermining democracy in Venezuela.[16] He has been sanctioned by other countries, such as Switzerland, for human rights violations. Tarek William Saab is a citizen and resident of Venezuela.

28.     Defendant Diosdado Cabello Rondón ("Cabello Rondón") is the *de facto* Minister for Interior, Justice and Peace for Venezuela, a position he has held since 2024. He previously was the illegitimate president of Venezuela's Constituent National Assembly, a body that Maduro set up to replace Venezuela's lawful legislative branch. Cabello Rondón has also served as President and Vice-President of Venezuela, and is an active member of the Venezuelan Army with the rank of Captain.[17] He was sanctioned by OFAC on May 18, 2018, for "exploit[ing] [his] official position[] to engage

---

[14] *See* Press Release, U.S. Dep't of Treasury, *Treasury Sanctions 13 Current and Former Senior Officials of the Government of Venezuela*, ¶ 1, (July 26, 2017) ("July 26, 2017 OFAC Press Release") https://www.treasury.gov/press-center/press-releases/Pages/sm0132.aspx.

[15] *See* Indictment, *United States v. Torres*, 15-cr-20 (E.D.N.Y. Jan. 21, 2015), https://www.justice.gov/doj/page/file/1261891/download.

[16] *See* July 26, 2017 OFAC Press Release, *supra* n. 13.

[17] Press Release, U.S. Dep't of State, *Diosdado Cabello Rondón – New Target*, (Mar. 26, 2020), https://www.state.gov/diosdado-cabello-rondon-new-target/.

in narcotics trafficking, money laundering, embezzlement of state funds, and other corrupt activities."[18] He is a leader of the Cartel of the Suns.[19] He was indicted for narco-terrorism conspiracy in the same indictment in which Maduro was charged, and he remains a fugitive from justice.

      29.    Defendant Alex Nain Saab Moran ("Alex Saab") was indicted in the United States District Court for the Southern District of Florida for conspiracy to commit money laundering in connection with a scheme involving at least $350 million in wire transfers.[20] The Center for a Free Cuba states, "Alex Saab's money-laundering network facilitated the profits of the Soles Cartel's cocaine trafficking to the United States."[21] Moreover, "Saab has played a key role in establishing and maintaining the illicit financial networks that facilitate corruption, and Maduro reportedly entrusted him with his personal wealth."[22] Secretary of State Marco Rubio has described Alex Saab as a "financier and money launderer for Maduro."[23] Saab also ran a scheme that stole

---

[18] Press Release, OFAC, *Treasury Targets Influential Former Venezuelan Official and His Corrupt Network*, (May 18, 2018), https://home.treasury.gov/news/press-releases/sm0389.

[19] Antonio Maria Delgado, *He Does It All: Military Captain, Lawmaker, Alleged Boss of Cartel Drowning U.S. in Drugs*, Miami Herald, (Nov. 28, 2023) (various "former high-ranking regime members, told the Herald in separate interviews that Cabello stands at the apex of the Cartel de Los Soles"), https://www.miamiherald.com/news/nation-world/world/americas/venezuela/article280897188.html.

[20] *United States v. Alex Nain Saab Moran*, 19-cr-20450 (S.D. Fla., July 25, 2019).

[21] *Cuba Brief: Déjà Vu in Venezuela for Cuba Watchers?*, Center for a Free Cuba, (Dec. 21, 2023), https://www.cubacenter.org/archives/2023/12/21/cubabrief-deja-vu-in-venezuela-for-cuba-watchers-american-hostages-swapped-for-high-profile-regime-figures-what-will-the-cost-be-in-future-hostages-and-american-lives.

[22] *Maduro Regime to Shield Alex Saab from Extradition*, Robert Lansing Institute, (June 23, 2021), https://lansinginstitute.org/2021/06/23/maduro-regime-to-shield-alex-saab-from-extradition/.

[23] Press Release, Senator Marco Rubio, *Rubio, Cruz Warn President Against Making Further Concessions to Maduro Narco Regime*, (Oct. 26, 2022), https://www.rubio.senate.gov/rubio-cruz-warn-president-against-making-further-concessions-to-maduro-narco-regime/.

780222892.8

hundreds of millions in dollars from food-import contracts at a time of widespread hunger mainly due to shortages in Venezuela. On or about October 16, 2020, Saab was extradited from the Republic of Cabo Verde to the United States to face criminal charges; however, Saab was subsequently released in exchange for ten U.S. citizens, including Plaintiffs Jerrel Kenemore, Edgar Marval and Jason Saab.

30.     Delcy Eloina Rodriguez Gomes ("Delcy Rodriguez") has been the *de facto* Vice President of Venezuela since 2018. She was also the *de facto* Minister of Economy, Finance and Foreign Trade of Venezuela from 2020 to 2024. OFAC sanctioned Delcy Rodriguez on September 25, 2018, explaining that "Maduro has given [her] and [her brother] Jorge Jesus Rodriguez Gomez senior positions within the Venezuela government to help him maintain power and solidify his authoritarian rule."[24]

31.     Jorge Jesus Rodriguez Gomez ("Jorge Rodriguez"), the brother of Delcy Rodriguez, and currently the President of the illegitimate National Assembly of Venezuela. OFAC sanctioned him on September 25, 2018. *Id.*

## JURISDICTION AND VENUE

32.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' federal ATA and RICO claims arise under the laws of the United States. This court has supplemental jurisdiction over Plaintiffs' state-law claims because those claims arise from the same nucleus of operative facts, and are part of the same case or controversy under Article III of the United States Constitution, as Plaintiffs' ATA and RICO claims.

33.     Venue properly lies in this forum under 18 U.S.C. 2334(a), which provides that

---

[24] *See* Press Release, U.S. Dep't of the Treasury, *Treasury Targets Venezuela President Maduro's Inner Circle and Proceeds of Corruption in the United States,* (Sept. 25, 2018), https://home.treasury.gov/news/press-releases/sm495.

"[a]ny civil action under section 2333 of this title [the ATA] against any person may be instituted in the district court of the United States for any district where any plaintiff resides." Plaintiffs Edgar Marval, Lady Stephanie Schulman Morris, SMS, and MSM reside in this judicial district.

34.     Venue properly lies in this forum under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district. First, Maduro's kidnapping of Plaintiffs Kenemore, Marval and Saad obtained the release of Alex Saab, a prisoner incarcerated in federal prison in Miami Florida. Second, the Defendants used Florida as a base from which to provide unlawful material support to Maduro (including through narcotics trafficking and money laundering in Florida).

35.     The Court has personal jurisdiction over the Defendants under the Florida long-arm statute, Florida Stat. § 48.193 and the Due Process Clause of the Fourteenth Amendment of the Constitution because the Defendants personally and/or through their agents committed a tortious act within the State of Florida, giving rise to Plaintiffs' claims, including:

a.     In the case of Maduro, committed an act of terrorism in Florida by kidnapping the Plaintiffs (including Marval, a Florida citizen) to obtain the release of the Alex Saab, who was incarcerated in Florida;

b.     In the case of all Defendants, committed an act of terrorism in Florida by providing material support to terrorists (i.e., to Maduro) in violation of 18 U.S.C. § 2339A and 18 U.S.C. § 2339C, in that Defendants trafficked cocaine in Florida intending that the monetary proceeds of their cocaine sales be used for acts of terror that included the kidnapping and torture of Jerrel Kenemore, Jason Saad, and Jose Marval; and

c.     In the case of all Defendants, committed an act of terrorism in Florida by providing material support to terrorists (i.e., to Maduro) in violation of 18 U.S.C. § 2339A and 18 U.S.C. §

2339C, in that Defendants laundered money in Florida, intending that the proceeds of said money laundering be used for acts of terror that included the kidnapping and torture of Jerrel Kenemore, Jason Saad, and Jose Marval;

d.      In the case of all Defendants, conspiring to do each of the foregoing acts.

36.      Defendants' torts against Jerrel Kenemore, Jason Saad, and Jose Marval were inextricably intertwined with, and a necessary and foreseeable component of, Defendants' trafficking of illegal drugs into and throughout South Florida, and their laundering money throughout South Florida, for their profit and gain.

37.      This Court has personal jurisdiction over the Defendants under the Due Process Clause of the Fifth Amendment (as to federal claims) because Defendants conduct relates to the United States and implicates important U.S. interests. *Fuld v. Palestinian Liberation Org.*, 145 S. Ct. 2090 (2025).

38.      In the alternative, this Court has personal jurisdiction over the defendants under Fed. R. Civ. P. 4(k)(2) because the defendants (a) are not subject to jurisdiction in any state's courts of general jurisdiction and (b) exercising jurisdiction over the defendants in the United States, including in this district, is consistent with the United States Constitution. Defendants themselves and/or through agents committed the following conduct in the United States, giving rise to Plaintiffs' claims:

a.      In the case of Maduro, committed an act of terrorism in United States by kidnapping the Plaintiffs (who are U.S. citizens) to obtain the release of the Alex Saab, who was incarcerated in the United States;

b.      In the case of all Defendants, committed an act of terrorism in the United States by providing material support to terrorists (i.e., to Maduro) in violation of 18 U.S.C. § 2339A and 18

U.S.C. § 2339C, in that Defendants trafficked cocaine in Florida intending that the monetary proceeds of their cocaine sales be used for acts of terror that included the kidnapping and torture of Jerrel Kenemore, Jason Saad, and Edgar Marval; and

      c.      In the case of all Defendants, committed an act of terrorism in Florida by providing material support to terrorists (i.e., to Maduro) in violation of 18 U.S.C. § 2339A and 18 U.S.C. § 2339C, in that Defendants laundered money in Florida, intending that the proceeds of said money laundering be used for acts of terror that included the kidnapping and torture of Jerrel Kenemore, Jason Saad, and Edgar Marval;

      d.      In the case of all Defendants, conspiring to do each of the foregoing acts.

39.      To the extent that this Court requires an additional basis to exercise jurisdiction over any of Plaintiffs' claims against any particular Defendant, this Court may exercise personal jurisdiction to the maximum extent permitted by the Constitution over such claims because Plaintiffs' claims all arise from the same common nucleus of operative fact.

## FACTUAL ALLEGATIONS

**I.    MADURO'S TERORISM AGAINST U.S. CITIZENS, INCLUDING THE PLAINTIFFS.**

40.      As set forth below, Maduro leveraged his illegitimate authoritarian control over Venezuela to orchestrate a massive years-long campaign of terrorism against the United States, including through narcoterrorism directed against the U.S. populace as a whole (for which Maduro has been indicted) and through the kidnapping and torture of U.S. citizens (such as Plaintiffs Mr. Kenemore, Mr. Marval and Mr. Saab), a practice Maduro utilizes to further his policy goals, including the bartering of U.S. captives for the release of Venezuelan criminals in U.S. custody.

**A.    Maduro's Illegitimate Authoritarian Control over Venezuela**

41.      Maduro assumed the Presidency of Venezuela on March 5, 2013, upon the death

of then-President of Venezuela Hugo Chavez. Maduro then began to consolidate power to position himself as Venezuela's dictator.

42.     In July 2017, Maduro orchestrated the illegitimate election of the Constituent Assembly, which usurped most legislative functions from the democratically elected National Assembly. In response, on August 18, 2017, the United States "strongly condemn[ed] the assumption of legislative powers by the illegitimate Constituent Assembly," and explained that "[i]n our view, the democratically-elected National Assembly is the only legitimate legislative body.'"[25] In 2023, the Eleventh Circuit—citing the above-referenced August 18, 2017 Press Statement from the State Department—explained that "[f]or more than five years, the executive branch has taken the position that the Maduro government is illegitimate." *PDVSA US. Litig. Trust v. Lukoil Pan Americas LLC*, 65 F.4th 556, 561, 563 (11th Cir. 2023). Moreover, "[t]he judicial branch is bound to accept the President's statement that the 2015 National Assembly, not the Maduro government, is the legitimate political authority in Venezuela." *Id.* at 562-63.

43.     The United States has subsequently reaffirmed this position. For example, on May 20, 2018, Venezuela held a presidential election. Although Maduro nominally "won" the presidential election, the election was neither free nor fair. Then-U.S. Secretary of State Michael Pompeo explained, "[s]ham elections change nothing. We need Venezuelan people running this country."[26]

44.     Notwithstanding the fact that the May 20, 2018 election was illegitimate, on January 10, 2019, Maduro was inaugurated as Venezuela's president—a result Maduro achieved

---

[25] *See* U.S. Dep't of State, *Department Press Briefing – August 18, 2017,* (Aug. 18, 2017), https://2017-2021.state.gov/briefings/department-press-briefing-august-18-2017/.

[26]     Michael     Pompeo     (@SecPompeo)     (May     20,     2018), https://twitter.com/SecPompeo/status/998254964408545283.

by the forceful and unlawful suppression of the legitimate government. On January 15, 2019, Venezuela's freely elected National Assembly declared Maduro a "usurper."

45.     In January 2019, the U.S. State Department implored "Maduro to step aside in favor of a legitimate leader reflecting the will of the Venezuelan people."[27] The White House, during the first Trump Presidency, stated that the United States will "continue to hold the illegitimate Maduro regime directly responsible for any threats it may pose to the safety of the Venezuelan people."[28]

46.     In 2020, the State Department's Country Reports on Human Rights Practices: Venezuela, explained that "While Venezuela is legally a multiparty, constitutional republic, the illegitimate authoritarian regime led by Nicolas Maduro usurped control over the executive, judicial, citizens' power (which includes the prosecutor general and ombudsman), and electoral branches of government, and stood up a parallel, illegitimate legislative body [the Constituent Assembly] alongside the existing elected one [the National Assembly]."[29]

47.     On January 3, 2023, Biden Administration spokesperson Ned Price stated, "Our approach to Nicolas Maduro is not changing. He is not the legitimate leader of Venezuela," rather "We continue to recognize what is the only remaining democratically elected institution in

---

[27] *See Pompeo Calls on Venezuela's Maduro to Step Down, Urges Support from Military,* Reuters, (Jan. 23, 2019), https://www.reuters.com/article/us-venezuela-politics-pompeo/pompeo-calls-on-venezuelas-maduro-to-step-down-urges-support-from-military-idUSKCN1PH2HI.

[28] *See* Jeremy Diamond and Boris Sanchez, *Trump recognizes Venezuelan opposition leader as nation's president,* CNN, (Jan. 24, 2019), https://www.cnn.com/2019/01/23/politics/trump-juan-guaido-venezuela/index.html.

[29] *See* U.S. Dep't of State, *2020 Country Reports on Human Rights Practices: Venezuela,* ("Venezuela Country Report"), at 1, https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/venezuela/.

780222892.8

Venezuela today, and that's the 2015 National Assembly."[30]

48.      On July 29, 2024, Maduro was declared the winner of yet another Presidential election that was widely regarded as a sham.[31] Following the election, the United States took further actions against the Maduro regime, including (i) imposing additional sanctions and visa restrictions against Maduro and his allies;[32] and (ii) seizing Maduro's presidential plane.[33]

49.      In February 2025, President Trump reversed certain sanctions concessions that the Biden Administration had afforded Venezuela, due in part to "Electoral conditions within Venezuela."[34]

50.      As of today the leading western democracies, and excluding pariahs such as North

---

[30] *See* U.S. Dep't of State, *Department Press Briefing – January 3, 2023*, (Jan. 3, 2023), https://www.state.gov/briefings/department-press-briefing-january-3-2023/#:~:text=MR%20PRICE%3A%20Well%2C%20Shaun%2C,to%20return%20democracy%20to%20Venezuela.

[31] Press Release, U.S. Dep't of State, *Assessing the Results of Venezuela's Presidential Election* (Aug. 1, 2024) ("The [Maduro-controlled National Electoral Council (CNE)'s] rapid declaration of Nicolás Maduro as the winner of the presidential election came with no supporting evidence. . . . Given the overwhelming evidence, it is clear to the United States and, most importantly, to the Venezuelan people that [opposition leader] Edmundo González Urrutia won the most votes in Venezuela's July 28 presidential election.), *available at* https://www.state.gov/assessing-the-results-of-venezuelas-presidential-election/.

[32] Press Release, U.S. Dep't of the Treasury, Office of Foreign Assets Control, *Treasury Targets Venezuelan Officials Aligned with Nicolas Maduro in Response to Electoral Fraud* (Sept. 12, 2024) (designation of "16 Maduro-aligned officials who obstructed a competitive and inclusive presidential election process in Venezuela and violated the civil and human rights of the people"), *available at* https://home.treasury.gov/news/press-releases/jy2577.

[33] Press Release, U.S. Dep't of Justice, *United States Seizes Aircraft Used by Nicolás Maduro Moros in Violation of U.S. Export Control and Sanctions Laws* (Sept. 2, 2024) ("This morning, the Justice Department seized an aircraft we allege was illegally purchased for $13 million through a shell company and smuggled out of the United States for use by Nicolás Maduro and his cronies," said Attorney General Merrick B. Garland), *available at* https://www.justice.gov/opa/pr/united-states-seizes-aircraft-used-nicolas-maduro-moros-violation-us-export-control-and.

[34] Anders Hagstrom, *Trump Says He's Terminating Chevron's Venezuela Agreement*, Fox Business (Feb. 27, 2025), *available at* https://www.foxbusiness.com/politics/trump-says-hes-terminating-chevrons-venezuela-oil-agreement.

Korea, Iran, Syria and Cuba—have ceased to recognize the Maduro regime as the legitimate government of Venezuela.

51.     In short, although Maduro continues to exert authoritarian control over Venezuela, he is no longer the head of state, and he has not been the head of state, or a member of the recognized government of Venezuela, since at least August 18, 2017.

### B.     Maduro's Anti-Americanism

52.     Maduro is virulently anti-American.

53.     Among other things, Maduro blames the United States for a variety of economic failings and social deprivations of the Maduro's own making. Maduro accuses the United States of "making threats" "with the sole aim of smothering the Venezuelan economy causing pain, unrest, and suffering to the Venezuelan people all to promote political instability in order to overthrow the legitimate government of President Nicolás Maduro Moros," and of enforcing a "financial blockade," which Maduro describes as "illegal unilateral coercive measures imposed by the United States government."[35]

54.     Maduro further blames non-Venezuelan actors, particularly the United States, for Venezuela's hyperinflation. And Maduro falsely accuses websites ("with servers in Miami, United States") of "fraudulent and criminal manipulation of the exchange rate."[36]

### C.     Maduro's Narcoterrorism Against the U.S. Populace

55.     For at least 20 years, and continuing through today, Maduro has intentionally

---

[35] *See* U.N. Human Rights Counsel, *Report of the Independent Expert on the promotion of a democratic and equitable international order on his county visit to the Bolivarian Republic of Venezuela: Comments by State*, ¶ 42(ii), (iv), U.N. Doc. A/HRC/39/47/Add.2, (Sept. 7, 2018), https://www.unwatch.org/wp-content/uploads/2018/10/Venezuelas-reply-to-De-Zayas-report.pdf.

[36] *See Id.* ¶ 42(x).

inundated the United States with tons of cocaine, not only to enrich Maduro himself, but also to harm the United States and its citizens. Every year, much of the illegal narcotics (especially cocaine) trafficked by Maduro lands by plane or boat in South Florida. In a background call on February 5, 2020, a senior White House official told journalists that Maduro "has turned Venezuela into a narco state, which has become a primary point of narcotics trafficking to Central America, Mexico, therefore the United States."[37]

56.     As scholars have explained, "[d]rug trafficking can exist for purposes other than profit. That is especially true when we consider Venezuela's Bolivarian Revolution that from the outset was dedicated to the development and deployment of illicit drugs for the purpose of asymmetrical warfare against the United States."[38] Indeed, the concept of using "drugs as a weapon is an idea originated by [former Cuban President] Fidel Castro, to intoxicate the American people," according to Luis Fleischman, a sociology professor at Palm Beach State University in Florida.[39] "The harm that is done by a ton of cocaine is almost incalculable. The lives affected, the families affected, the communities affected by drugs of that type and that volume is staggering."[40]

57.     On March 26, 2020, the DOJ unsealed indictments charging myriad crimes against Maduro and other Venezuelan leaders for narcotics trafficking and narcoterrorism. Summing up the charges, then-U.S. Attorney General William P. Barr explained that "[t]he Venezuelan regime,

---

[37] Geoff Ramsey and David Smilde, *Beyond the Narcostate Narrative, What U.S. Drug Monitoring Data Says About Venezuela,* WOLA, (Mar. 2020), https://www.wola.org/wp-content/uploads/2020/04/Narcostate-memo-EDITED.pdf.

[38] *Weaponized Drug Trafficking: How Venezuela Built a Super Cartel to Attack the United States*, Center for a Secure Free Society, (Sept. 22, 2022), https://www.securefreesociety.org/research/weaponized-drug-trafficking/.

[39] *Venezuela Built Drug 'Super Cartel' to Attack US, Think Tank Says*, Dialogo Americas, (Apr. 3, 2023), https://dialogo-americas.com/articles/venezuela-built-drug-super-cartel-to-attack-the-us-think-tank-says/.

[40] *United States v. Pelagio Suarez,* 16-cr-453 (S.D.N.Y.), Dkt. No. 160, Tr. 27.

once led [lawfully and now controlled illegally] by Nicolás Maduro Moros, remains plagued by criminality and corruption. . . . For more than 20 years, Maduro and a number of high-ranking colleagues . . . conspired with the FARC, causing tons of cocaine to enter and devastate American communities."[41]

58.     Geoffrey S. Berman, who then was the United States Attorney for the Southern District of New York, further explained how Maduro and his cronies leveraged their authoritarian power in Venezuela to support their narcoterrorism specifically aimed at injuring U.S. citizens:

> Today we announce criminal charges against Nicolás Maduro Moros for running, together with his top lieutenants, a ***narco-terrorism*** partnership with the FARC for the past 20 years. . . The scope and magnitude of the drug trafficking alleged was made possible only because Maduro and others corrupted the institutions of Venezuela and provided political and military protection for the rampant narco-terrorism crimes described in our charges. As alleged, Maduro and the other defendants ***expressly intended to flood the United States with cocaine in order to undermine the health and wellbeing of our nation***. Maduro very deliberately deployed cocaine as a weapon. While Maduro and other cartel members held lofty titles in Venezuela's political and military leadership, the conduct described in the Indictment wasn't statecraft or service to the Venezuelan people. As alleged, the defendants betrayed the Venezuelan people and corrupted Venezuelan institutions to line their pockets with drug money.[42]

---

[41] *See* DOJ Press Release, *supra* n. 6, ¶ 1; Julieta Pelcastre, *Investigation Lays Out Deep Involvement of Maduro in Drug Trade*, Dialogo Americas, (Dec. 20, 2023) ("The management of cocaine trafficking in Venezuela is not something new," Euclides Tapia, a senior lecturer in International Relations at the University of Panama, told *Diálogo* on November 26. "Since Maduro took control, he has been identified as the main person responsible for this illegal and money-laundering mechanism."); https://dialogo-americas.com/articles/investigation-lays-out-deep-involvement-of-maduro-regime-in-drug-trade/; *Venezuela Built Drug Super Cartel to attack the US, Think Tank Says,* Dialogo Americas, (Apr. 3, 2023) ("Drug trafficking can exist for purposes other than profit," the report indicates. "That is especially true when we consider Venezuela's Bolivarian Revolution that from the onset was dedicated to the development and deployment of illicit drugs for purposes of asymmetric warfare against the United States."), https://dialogo-americas.com/articles/venezuela-built-drug-super-cartel-to-attack-the-us-think-tank-says/.

[42] See DOJ Press Release, Dep't of Justice, *Nicolás Maduro Moros and 14 Current and Former Venezuelan Officials Charged with Narco-Terrorism, Corruption, Drug Trafficking and Other Criminal Charges* (Mar. 26, 2020), https://www.justice.gov/opa/pr/nicol-s-maduro-moros-and-14-current-and-former-venezuelan-officials-charged-narco-terrorism#:~:text=Berman.,crimes%20described%20in%20our%20charges (emphasis added).

D.     **Maduro's Kidnapping of U.S. Citizens For Political Gain, Including To Barter U.S. Hostages for Venezuelan Criminals Incarcerated In the United States**

59.     On November 18, 2016, two of Maduro's wife's cousins, Efrain Antonio Campo Flores and Franqui Francisco Flores (commonly referred to as the "narco nephews"), were convicted of conspiracy to smuggle cocaine into the United States. On December 14, 2027, the narco nephews were sentenced to 18 years in federal prison. The Acting Manhattan U.S. Attorney explained that their crimes were motivated, in part, by a desire to enhance Maduro's political power at home: "In part to fund an election campaign for the First Lady of Venezuela, Efrain Antonio Campo Flores and Franqui Francisco Flores de Freitas devised a plan to work with the FARC terrorist organization to send literally tons of cocaine to the United States."[43] The U.S. prosecutors alleged further that the nephews were affiliated with the Cartel of the Suns.

60.     In response to the capture and incarceration of the narco nephews, on November 21, 2017, Maduro arrested and detained in Venezuela six U.S. citizens (the "Citgo Six") who were senior executives of Citgo, which was at the time was the wholly owned U.S. subsidiary of Defendant PDVSA. PDVSA lured the Citgo Six to Venezuela on the pretext of a legitimate business meeting. The Citgo Six were indicted in Venezuela on bogus charges of signing an agreement that was "unfavorable" to PDVSA. The Citgo Six were granted house arrest in December 2019, but then—demonstrating Maduro's view that the arrest was political—they were sent back to prison when President Trump met with Venezuela opposition leader Juan Guaido.

61.     Subsequently, in response to other U.S. actions that angered Maduro, the Citgo 6

---

[43] Press Release, U.S. Dep't of Justice, *Nephews Of Venezuela First Lady Each Sentenced To 18 Years In Prison For Conspiring To Import Cocaine Into The United States,* (Dec. 14, 2017), https://www.justice.gov/usao-sdny/pr/nephews-venezuela-first-lady-each-sentenced-18-years-prison-conspiring-import-cocaine.

were sent to the notorious Venezuela prison, El Helicoide. El Helicoide, a former 1950s shopping mall turned prison, is run by Maduro's feared secret police, the SEBIN, and is renowned for its brutal treatment of the political prisoners and others held there. The Guardian describes it as a "high-profile prison for political detainees" where prisoners report "people being beaten, electrocuted, hung by their limbs, forced into stress positions and forced to plunge their face into a bag of feces and breathe in."[44] Other El Helicoide prisoners report being forced to eat excrement.[45]

62.     In October of 2022, the United States agreed to release the narco nephews in exchange for six U.S. citizens (including five of the "Citgo Six") and one U.S. lawful permanent resident that Maduro had unlawfully kidnapped.[46]

63.     Senator Marco Rubio explained that "I wanted those people released as much as anybody," but "I think seven innocent American hostages in exchange for two convicted drug dealers who happen to be the nephews of Maduro is a huge win for Maduro and, unfortunately, puts Americans all over the world now in danger" because it sends a message "tyrants and dictators all over the world to go ahead and trump up some charges and arrest Americans, because, when

---

[44] *See* Emma Graham Harrison, *Downward Spiral: How Venezuela's Symbol of Progress Became a Political Hell*, The Guardian, (Sept. 15, 2017), https://www.theguardian.com/world/2017/sep/15/el-helicoide-venezuela-caracas-building-symbol.

[45] *See* Rachell Krygier and Joshua Partlow, *In Venezuela, Prisoners Say Abuse Is So Bad They Are Forced to Eat Pasta Mixed with Excrement*, Washington Post, (June 24, 2017), https://www.washingtonpost.com/world/the_americas/in-venezuela-prisoners-say-abuse-is-so-bad-they-are-forced-to-eat-pasta-mixed-with-excrement/2017/06/23/39a0c85e-4acb-11e7-987c-42ab5745db2e_story.html.

[46] Press Statement, U.S. Dep't of State, *The Release of US Nationals from Venezuela*, (Oct. 1, 2022) ("We welcome the release from Venezuela of six wrongfully detained U.S. citizens . . . ."), https://www.state.gov/the-release-of-u-s-nationals-from-venezuela/; George Wright, *US Frees President Maduro's Relatives in Venezuela Prisoner Swap*, BBC, (Oct. 1, 2022), https://www.bbc.com/news/world-latin-america-63105944.

the time comes, we will be able to exchange them."[47]

  **E.**  **Maduro's Kidnapping and Torture of the Plaintiffs**

    **1.**  **Maduro Indiscriminately Snatches Innocent US Citizens to Trade for Alex Saab, Who Was Awaiting Trial In Miami.**

  64.  In June 2020, Defendant Alex Saab was detained in the Republic of Cabo Verde. On or about October 16, 2020, he was extradited to the United States to face charges, including eight counts of money laundering. Specifically, he stood accused of moving $350 million out of Venezuela into accounts he controlled in the United States and other countries.[48]

  65.  While Saab was incarcerated in Miami pending trial, one journalist familiar with these matters explained, "Saab acts as an international broker for Maduro, making him a fundamental builder of the financial architecture used by Venezuela to circumvent sanctions. . . . That world of relationships would be exposed if Saab decides to speak."[49] That risk of exposure caused Maduro significant concern. On top of which, Maduro wanted to demonstrate that his lieutenants are beyond the reach of U.S. justice,

  66.  Accordingly, Maduro launched a kidnapping spree to capture U.S. citizens who

---

[47] Olifimihan Oshin, *Rubio: Prisoner swap with Venezuela 'puts Americans all over the world ... in danger,'* The Hill (Oct. 2, 2022), https://thehill.com/homenews/sunday-talk-shows/3671036-rubio-prisoner-swap-with-venezuela-puts-americans-all-over-the-world-in-danger/.

[48] *See* Press Release, DOJ, *Colombian Businessman Charged With Money Laundering Extradited to the United States from Cabo Verde*, (Oct. 18, 2021), https://www.justice.gov/opa/pr/colombian-businessman-charged-money-laundering-extradited-united-states-cabo-verde.

[49] Venezuela Investigative Unit, *Alleged Money Launder Alex Saab Facing US Justice Triggers Fallout from Venezuela,* InSight Crime, (Oct. 19, 2021), https://insightcrime.org/news/alleged-money-launderer-alex-saab-facing-us-justice-triggers-fallout-from-venezuela/; Emanuele Ottolenghi, *Corrupt Venezuela Officials Face Impending Extradition to United States*, Foundation for Defense of Democracies, (Sept. 13, 2021) (Saab is a "regime insider" with "intimate knowledge of its shady dealings."), https://www.fdd.org/analysis/2021/09/13/venezuelan-officials-impending-extradition/).

could be swapped for Alex Saab's release. The number of persons kidnapped by Maduro "swelled . . . and U.S. officials are concerned that Caracas is deploying increasingly aggressive tactics to lure and entrap U.S. citizens at its borders, extort their families on the false promise of their return and use them as pawns to draw concessions from Washington."[50]

### 2.   Maduro's Playbook for the Defamation and Torture of His Kidnapping Victims.

67.     The Venezuelan Directorate General of Military Counterintelligence ("DGCIM") reports directly to Maduro as the *de facto* commander-in-chief of Venezuela's army, and reports administratively to Defendant Padrino Lopez, as the *de facto* Minister of Defense. Maduro has the power to appoint and remove the DGCIM's director, who also acts as an advisor to Maduro regarding the appointment of key military personnel. The DGCIM has broad powers to "conduct, coordinate and execute activities aimed at the discovery, prevention and shutdown of enemy activity." Its duties including protecting Maduro's person.

68.     The DGCIM is responsible for carrying out initial investigations into Maduro's political targets, arresting them, interrogating them, and detaining them. The detentions take place mainly at DGCIM headquarters offices in Boleíta Norte, Caracas, outside the purview of the penitentiary system. The DGCIM routinely tortures its prisoners. "DGCIM torture methods evolved between 2014 and 2020, with a marked increase in violence since 2017."[51]

69.     On July 11, 2019, OFAC sanctioned the DGCIM in response to the "Maduro

---

[50] Michael Wilner, *Extorted and Tortured, and American Prisoner in Venezuela Awaits Action from Biden*, McClatchy Media Network, (Feb. 13, 2023), Floridian trapped, tortured in Venezuela, his family says | McClatchy Washington Bureau (mcclatchydc.com); *see generally* Drew Hinslaw et al., *How Snatching American Citizens Turned Into a Tool of Hostile Governments*, Wall Street Journal, (Dec. 27, 2023), https://www.wsj.com/world/american-hostages-hostile-governments-cc7343a8.

[51] UNHRC Detailed Factual Findings, ¶ 319.

regime's inhumane treatment of political opponents, innocent civilians, and members of the military in an effort to suppress dissent."[52]

70.     When Maduro—through intelligence services such as the DGCIM—targets political prisoners including U.S. citizens, he has a typical modus operandi ("MO") for doing so. In other words, he has a "playbook" that he typically follows.

71.     First, the "playbook" for the Maduro's attacks on political prisoners begins with the arbitrary arrest of an innocent individual. As the United Nations Human Rights Council ("UNHRC") has explained, it "identified a pattern"—which was "commonplace"—"in which DGCIM officers failed to present arrest warrants and/or failed to explain the reason for the detention at the moment of arrest, in violation of [Venezuela] national and international human rights standards."[53]

72.     Second, "within hours or days of arrests, high-level Government authorities [typically] ma[k]e public declarations" falsely accusing the political prisoners of "crimes" against the Venezuelan state and/or Maduro himself, and smearing the victims with other spurious accusations.[54]

73.     Third, the DGCIM holds the prisoners incommunicado at secret locations, where they are tortured. The "DGCIM frequently detain[s] people in secret or unofficial detention facilities, especially in the first hours or days of detention."[55] "The first days [often are] spent . . .

---

[52] Press Release, Treasury Sanctions Venezuela's Military Counterintelligence Agency Following the Death of a Venezuelan Navy Captain (July 11, 2019), https://home.treasury.gov/news/press-releases/sm727.

[53] UNHRC Detailed Factual Findings, ¶ 309.

[54] *Id.* ¶ 311.

[55] *Id.* ¶ 315.

in DGCIM [Headquarters in] Boleíta" Caracas.[56]

74.     "Acts of torture usually [occur] during interrogations, shortly after arrest while detainees [are] held incommunicado."[57]

75.     Fourth, prisoners are transferred to longer term holding cells, the location of which varies depending on the prisoner. "Cases of major importance (political enemies, high-ranking military personnel) are held in Boleíta, intermediate cases are transferred to Fort Tiuna and the simplest cases are transferred to Ramo Verde."[58]

76.     The conditions at the locations are so cruel they constitute further torture. Among other things:

a. "Detainees are frequently not permitted calls to their relatives, with calls sometimes limited to two minutes every two weeks."

b. "The cells in DGCIM Boleíta are in the basement, referred to as Basement 1, without natural light or ventilation. Cells are around 2.75 x 2 meters, often with two or three occupants. . . . [A]rtificial lighting [is] on 24 hours a day, affecting the notion of time."[59]

c. "Cells [lack] bathrooms and detainees [must] to relieve themselves in bags."[60]

d. "Detainees [sleep] on a cement platform with a very thin mattress."[61]

e. "There [is] no access to drinking water and detainees suffered from stomach illnesses. Detainees interviewed complained of respiratory diseases and skin

---

[56] *Id.*

[57] *Id.* ¶ 317.

[58] *Id.* ¶ 329.

[59] *Id.* ¶ 311.

[60] *Id.*

[61] *Id.* ¶ 332.

diseases due to the lack of sun and extreme weight loss, as well as psychological problems."[62]

f.   "Detainees described a punishment cell known as 'El Cuarto de los Locos'(the Crazy Room). It was lined with padded walls and detainees slept on the floor. As with the regular cells, there [is] no bathroom access, so detainees had to use a plastic bag, which was changed once a week. Guards provided meals once or twice a day, in small portions, 'enough to keep you alive.'"

### 3.   Kidnapping and Torture of Jerrel Kenemore (643 days)

77.   The Kenemore family has lived in Texas for the last 40 years. Jerrel Kenemore is an IT professional and part of a close knit family middleclass family. His kidnapping and torture caused great emotional trauma to Mr. Kenemore's children and sisters, nieces and nephews and family friends.

78.   In 2019, in the wake of a painful divorce, Jerrel Kenemore moved to a town just outside of Bogota, Colombia.

79.   On or about March 14, 2022, Mr. Kenemore stopped at a grocery store in Columbia, near the Colombian-Venezuelan border. While Mr. Kenemore and a few others were outside the store, masked gunmen abducted Mr. Kenemore and those who were with him.

80.   The gunmen, believed to be members of a local Colombian gang or paramilitary group that operates along the border, held Mr. Kenemore and others captive for six days while attempting to extort money from various relatives of the captives. During this time, Mr. Kenemore endured repeated beatings and relentless psychological torment. The kidnappers kept him hooded for days, routinely pressing guns to his head and threatening his life as they demanded banking

---

[62] *Id.* ¶ 333.

information and account numbers in their extortion attempts. The ordeal was brutal and disorienting, leaving lasting physical and emotional scars on both Mr. Kenemore and his family.

81. On March 17, 2022, the kidnappers forced Mr. Kenemore and the other men to march to a Colombian/Venezuelan border checkpoint near the Simon Bolivar International Bridge. The kidnappers then forced Mr. Kenemore and the other victims to cross the border into Venezuela at gunpoint, where the kidnappers turned the abductees over to the Venezuelan immigration authorities.

82. What happened next was straight out of the "playbook" (described above) that describes Maduro's MO for the capture and mistreatment of political prisoners, including innocent U.S. hostages.

83. First, the Venezuela immigration officers arrested Mr. Kenemore without any charges or lawful reason.

84. Second, the Venezuelan immigration officers handed Mr. Kenemore over to the DGCIM. The DGCIM reports to Maduro, who directly authorized and instructed the DGCIM to kidnap and abuse U.S. citizens, including Mr. Kenemore.

85. Third, the Venezuelan authorities leveled bogus charges against Mr. Kenemore for supposed "espionage" and "counterintelligence activities," falsely claiming he was an American spy working against the Maduro regime. As is typical in these cases, there was no truth whatsoever to those charges.

86. Fourth, the DGCIM held Mr. Kenemore at its La Maxima II facility in Caracas, Venezuela, where he remained for 643 days, until the United States negotiated his release on December 20, 2023.

87. Fifth, during his imprisonment, the DGCIM tortured Mr. Kenemore.

a.  For the first 40 days of his captivity, Mr. Kenemore was held in isolation, routinely denied food and water, and deprived of light.

b.  After the isolation period, he was transferred to cells in the basement where he was further tortured.

c.  Mr. Kenemore also suffered the psychological abuse during his imprisonment. This type of abuse known as "white torture," intended to break the mind without leaving visible scars. He was denied outdoor access for weeks at a time and subjected to cruel psychological manipulation by being told he would be allowed to go outside, sometimes even taken from his cell and lined up, only to be abruptly sent back. On some occasions, he was taken out solely for staged photographs before being returned to isolation. On many days, he was forced to inhale intense gasoline and paint fumes. Prison officials falsely blamed poor ventilation, but guards later admitted the exposure was intentional. Medications and personal belongings, including letters from his family, were routinely withheld or stolen. He endured severe food insecurity, often receiving spoiled food and going days without clean drinking water. At night, he heard the screams of other prisoners from areas near the cell block, and was subjected to prolonged periods of light deprivation or excessive lighting as forms of unwarranted punishment. In addition, the warden and prison staff arbitrarily prevented Mr. Kenemore from attending his scheduled court appearances—his only opportunity to see his attorney or communicate with his co-defendants. They claimed no transport vehicles were available, despite the visible presence of several available vehicles parked on-site. These conditions caused lasting psychological trauma and physical harm. As one of his fellow U.S. citizen

28

prisoners explained, "[w]hen you find peace there, they do everything in their power to make you lose that peace and they try to drive you crazy. They have a lot of psychological tactics."[63]

d. Exacerbating his own suffering, Mr. Kenemore also witnessing the DGCIM torture other American and Venezuelan prisoners, including subjecting victims to electric shock with car batteries and the injections of unknown substances.

e. During his incarceration, the DGCIM denied Mr. Kenemore necessary medicine and medical care. Among other things, the DGCIM denied Mr. Kenemore the medicine he needs for his heart condition, the medicine he needs to ameliorate his clinical depression, and the CPAP machine he needs to sleep. Moreover, the stress that the DGCIM imposed on Mr. Kenemore compounded his medical conditions.

f. As a direct result of the DGCIM's denial of medicine, together with the DGCIM's torture and harsh, demeaning, and belittling attitude, Mr. Kenemore twice attempted suicide.

88. The DGCIM also retaliated against Mr. Kenemore when he tried (e.g., through three hunger strikes, and through confrontations with the Subdirector of the prison, Marlon Solas Riva) to protest his inhumane conditions of confinement.

a. As a punishment against Mr. Kenemore for his resistance to his captors, the DGCIM isolated Mr. Kenemore and denied him water.

b. As yet another punishment, the DGCIM threatened to arrest other members of Mr. Kenemore's family who brought him medication, sexually assaulted a female

---

[63] *Americans Imprisoned in Venezuela: "They're Trying to Drive You Crazy,"* CNN, (Dec. 22, 2023), https://newsbeezer.com/venezulaeng/americans-imprisoned-in-venezuela-theyre-trying-to-drive-you-crazy/.

relative who sought to bring him medicine, and at times prohibited family members from visiting him entirely.

c.  Mr. Kenemore, a devout Christian, relied on his faith to get through his ordeal and held Bible study classes and worship services for some of his fellow prisoners. Knowing how important this was to Mr. Kenemore, the DGCIM Subdirector also punished Mr. Kenemore by cancelling his classes.

89.     All of these retaliatory actions inflicted further emotional distress and suffering on Mr. Kenemore and his family.

90.     During the initial period of his detention, Mr. Kenemore's whereabouts remained a mystery to his U.S. family (including his two sons and one daughter from his earlier marriage and his sisters, Jeana Kenemore Tillery and Tina Rachael Porras). They only knew he had been abducted by a Colombian gang. The uncertainty about Mr. Kenemore's whereabouts inflicted considerable mental anguish and trauma on the family as they frantically tried to locate him.

91.     Mr. Kenemore's family, upon eventually learning of his abduction and subsequent incarceration by the DGCIM, began a tireless crusade to obtain his release.

92.     Among other things, Mr. Kenemore's two sons contacted the U.S State Department and the U.S. Embassy in Columbia to assist in obtaining his release. Initially, these efforts yielded no results.

93.     In May 2023, Mr. Kenemore's sister, Jeana Tillery, took over efforts to work with the U.S. State Department to obtain Mr. Kenemore's release. Through relentless advocacy, Jeana Tillery was able to raise awareness of Mr. Kenemore's plight and have the State Department declare him a "wrongfully detained" person, thereby allowing Robert Carstens, the U.S. Special Presidential Envoy for Hostage Affairs (SPEHA), to negotiate with Maduro for Mr. Kenemore's

release. Other senior U.S. government officials also played important roles in the hostage-release negotiations.

94.     Ultimately, the United States agreed to swap Alex Saab, who was awaiting trial for money laundering in a federal penitentiary in Miami, Florida, in exchange for Maduro's agreement to release ten U.S. citizen hostages, including Plaintiffs Jerrel Kenemore, Jason Saad, and Edgar Marval.

95.     On December 20, 2023, Maduro put Mr. Kenemore (along with Mr. Marval, Mr. Saab, and others) on an airplane owned by PDVSA. The hostages' heads were covered with hoods during the flight, blinding them. They were flown to an airstrip in the Caribbean island nation of St. Vincent and the Grenadines and transferred back to the United States. Defendant Jorge Rodriguez was present for the prisoner exchange on St. Vincent and the Grenadines.

96.     Following his release, Mr. Kenemore still suffers from a wide range of recurring mental and physical health issues stemming from his unlawful detention. He experiences frequent panic attacks, severe anxiety, persistent nightmares, and chronic insomnia. He has developed an intense fear of people and public places—symptoms consistent with agoraphobia—which significantly limit his daily functioning. His ability to concentrate, which is vital to his work as an IT professional, has been deeply compromised. He also struggles with severe depression and profound survivor's guilt. In addition to these psychological effects, Mr. Kenemore continues to endure lasting physical harm, including nerve and ligament damage to his hands and wrists caused by prolonged and excessive handcuffing, and permanent injury to his left shoulder that was never properly treated while incarcerated. He also suffers from stomach ulcers and other ongoing stress-related physical ailments.

97.     Mr. Kenemore's ordeal was extremely difficult for his family. They had little

ability to communicate with him while he was in Maduro's dungeons, which was very stressful for all members of the Kenemore family. The emotional toll of Mr. Kenemore's unlawful detention extended far beyond his own suffering and deeply impacted each member of his immediate family. His sister, Rejeana Ann Kenemore Tillery, endured severe depression, anxiety, chronic nightmares, and insomnia. The relentless stress led to significant dental damage from involuntary grinding and worsened her pre-existing fibromyalgia and chronic fatigue syndrome. As the family's primary point of contact with the U.S. State Department, Ms. Tillery was forced to endure extended periods of isolation from her loved ones while simultaneously fielding constant, manipulative communications from individuals attempting to pressure her into advocating for the release of Alex Saab—a known operative of the Maduro regime.

98.     Mr. Kenemore's other sister, Tina Rachael Porras, also suffered from depression, anxiety, nightmares, and insomnia as a result of her brother's detention. His eldest son, Jerrel Lloyd Kenemore II, experienced such profound depression and anxiety that it manifested in physical illness and led to substance abuse as a desperate attempt to cope. Tristan Alexander Lee Kenemore, his younger son, struggled with severe anxiety, depression, and panic attacks. Mr. Kenemore's daughter, Zoe Athena Vera Lynn Kenemore, endured similar symptoms—depression, anxiety, nightmares, and insomnia—which significantly complicated her pregnancy and made it extraordinarily difficult for her to care for her young children. The psychological trauma inflicted upon this family has been deep, enduring, and generational.

99.     Maduro viewed the prisoner exchange through which he obtained Alex Saab's release as an important victory, helpful for ensuring the continued undivided loyalty of his criminal network. "A key message is from President Maduro towards his own," said Luis Vicente Leon, president of Datanálisis, a polling and political analysis firm in Venezuela. "By having pushed

32

hard for Saab to be freed, he has made it clear that he will fight for allies."[64]

100.    The United States viewed the prisoner exchanges as important protection for its individual citizens, with the President stating:

> Today, ten Americans who have been detained in Venezuela have been released and are coming home, including all six wrongfully detained Americans [including Mr. Kenemore, Mr. Marval and Mr. Saad]. These individuals have lost far too much precious time with their loved ones, and their families have suffered every day in their absence. I am grateful that their ordeal is finally over, and that these families are being made whole once more. …
>
> Reuniting wrongfully detained Americans with their loved ones has been a priority for my Administration since day one.

### 4.    Kidnapping and Torture of Edgar Marval (123 days)

101.    The Plaintiffs (and the other prisoners with whom they were held captive) generally agree that, as bad as things were for them, the situation was decidedly worse for Mr. Marval. During his captivity, Mr. Marval happened to be at the mercy of one of Maduro's most sadistic henchmen, a DGCIM officer who beat Mr. Marval brutally and repeatedly, breaking Mr. Marval's back.

102.    Mr. Marval was also tortured with electric shocks, including to his genitals.

103.    Maduro also subjected Mr. Marval to psychological torture, including constant threats from the DGCIM that if Mr. Marval complained or went public, they would take his children, and he would never see them again.

104.    As with Mr. Kenemore, Maduro falsely accused Mr. Marval of being a "terrorist." To support this bogus accusation, the DGCIM planted two grenades and rounds of ammunition in

---

[64] Elia Ferer Breda, *Venezuela Prisoner Exchange: What Does It Mean*, Forbes, (Dec. 21, 2023), https://www.forbes.com/sites/eliasferrerbreda/2023/12/21/venezuela-prisoner-exchange-what-does-it-mean/?sh=630535a142c9.

Mr. and Ms. Marval's house in Venezuela.

105.    When the DGCIM first kidnapped Mr. Marval, his wife (Lady Stephanie Schulman Morris) was in the hospital with the couples' 11-year old son.

106.    The DGCIM confiscated Mr. Marval's cell phone, tortured him until he revealed his passwords and used the phone to withdraw Mr. Marval's life savings from his U.S. banks accounts. They never returned the phone to him.

107.    Plaintiff Lady Stephanie Schulman Morris also owned property in Venezuela, including a home and part of the two pharmacies, all of which Maduro unlawfully confiscated without cause or justification.

108.    Mr. Marval's ordeal was extremely difficult for his family. They had no ability to communicate with him while he was in Maduro's dungeons, which was very stressful for all members of the family.

109.    For example, the night Mr. Marval was detained, Lady retuned to the house from the hospital (where her son was being treated) to care for her infant daughter. Suddenly, DGCIM agents arrived and raided the house. They took Lady and her infant daughter outside while agents swarmed the house, and did not allow her to take any of the baby's items (bottles, diapers, clothes, etc.). Crying and in disbelief, Lady attempted to plead with the DGCIM agents to allow them to take some basic items. The agents called her an "American bitch," taunted her, and did not allow her access to any of her documents, or baby's basic items. Defendants' agents also told Lady that they were going to take her kids away, and that she would never see them again.

110.    While Mr. Marval was detained, his wife Lady became aware of the extreme torture that he was subject to. DGCIM agents called her to extort her money, and told her some of the things they were doing to Mr. Marval, requesting money to avoid them killing Mr. Marval. All

of this was very traumatic for her.

111.     As a result of Mr. Marval's detention, torture, extortion and threats by the Defendants' agents, Lady suffered from anxiety, depression, insomnia, and trouble concentrating, tremors. She lost over 10 kilos in a matter of weeks, her cheeks became darker, and her eyes sunk into their sockets. Family and friends told her that she was unrecognizable. The physical and psychological damage was profound.

112.     Their kids also suffered from anxiety, insomnia, terrors, and a constant feeling of persecution while their father was detained, and their mother was dealing with Defendants' threats and just trying to keep her husband alive in the midst of his detention and torture. Indeed, the 11-year-old son had to care for the baby while his mother was trying to keep Mr. Marval alive as friends and relatives were also threatened by Defendants to stay away from Lady and her children.

113.     Mr. Marval was returned to U.S. soil on December 20, 2023, on the same flight as Mr. Saad, Mr. Kenemore and the other U.S. prisoners who Maduro released in exchange for Alex Saab.

114.     A picture snapped of Plaintiffs Jason Saad (in red), Jerrel Kenemore (with his arm around Mr. Saad) and Edgar Marval (shown lying down in a gurney) that was taken upon their return to the United States shows that Mr. Marval, unlike his fellow victims, was too weak to stand on his own—but nevertheless, in a triumph of spirit, Mr. Marval is smiling and signaling his gratitude with two thumbs up.



### 5.   Kidnapping and Torture of Jason Saad (560 days).

115.   When Jason Saad was growing up, his family owned a jewelry store and he learned many aspects of the jewelry trade, including how to evaluate, carve and polish gemstones.

116.   In April 2017, Mr. Saad moved to Colombia, where he was self-employed carving emeralds and performing other work related to the creation of jewelry. Unfortunately, his work in the jewelry trade attracted bandits and he was victimized by roving gangs and other criminals in Colombia.

117.   As a result, by November 2017, Mr. Saad had moved on from Colombia to Venezuela, where Mr. Saad took various jobs, including working construction around the city of Puerto Cabalo, Venezuela, not too far from the Colombian border. For several years, Mr. Saad lived in Venezuela, working peacefully and without incident.

118.   Then, on June 8, 2022, when Mr. Saad was at a small corner market (where he

helped clean up when he was not working construction), five armed DGCIM agents, without warning, swarmed Mr. Saad, shouting "terrorist, terrorist, terrorist." Mr. Saad is not, and never has been, a terrorist or any other type of violent criminal.

119.    The DGCIM agents handcuffed Mr. Saad, put a black bag over his head, and hogtied him. They transported him to a DGCIM office in Maracaibo, Venezuela, where they held him incommunicado for eight days, during which time Mr. Saad was kept on a mattress in the DGCIM offices—most of which time he remained hogtied.

120.    The DGCIM interrogated Mr. Saad, accusing him of being a terrorist. They showed him a newspaper picture of two persons on a boat who were bringing guns into Venezuela and accused him of conspiring with those persons and of plotting to assassinate Maduro. Those accusations were false. Indeed, Mr. Saad had never seen the newspaper articles, the pictures, the persons in the pictures, the boat or guns before.

121.    During the "investigations," the DGCIM brought in a woman to translate (English/Spanish), but she spoke with Mr. Saad for only a few minutes, during which time she repeatedly called him a terrorist (untrue) and an American (true).

122.    After eight days of isolation coupled with harsh and intimidating interrogations, the DGCIM took Mr. Saad to see a military doctor, who examined Mr. Saad but did not do anything to treat or help him.

123.    During his time in Maracaibo, Mr. Saad had a brief—and farcical—exposure to the Venezuela judicial system. At his initial court date, Mr. Saad was told that he would be evaluated  for 45 days. In fact, he was held (first at Maracaibo, and later in Caracas) for 557 days, during which time he had no access to a lawyer and no further court appearances.

124.     After about 10 days in Maracaibo, the DGCIM then put Mr. Saad on board a plane to relocate him. On that trip, which lasted for four to five hours, Mr. Saad was put in a stress position, which is a favored method of DGCIM torture. Specifically, Mr. Saad was forced to kneel with his hands bound behind him, and raised up so that his shoulder almost broke and the tendons in his arm were ripped.

125.     At the end of the flight, when Mr. Saad arrived in Caracas and was taken to a DGCIM prison there, Mr. Saad was thrown into a cell where (for all but the first two days) he was alone.

126.     The facility where Mr. Saad was held was Maduro's chosen facility for housing U.S. hostages. Others falsely imprisoned there included Mr. Kenemore and Mr. Marval, as well as a number of other U.S. hostages.

127.     Mr. Saad was held alone and indoors. Only on Saturdays was Mr. Saad allowed to go outside, where he met other U.S. prisoners.

128.     At various times during his captivity in Caracas, Mr. Saad was told, by various of his captors, that he was being held because he was supposed to be "a terrorist," a "gringo," and because he had tattoos.

129.     During his incarceration, Mr. Saad was denied medical care. He repeatedly requested medical attention for his injured shoulder, but received none. He developed a rash due to the rough and unsanitary conditions in which he was held, but received no adequate treatment for that, either. As a result of the lack of hygienic conditions, he had two teeth get infected, which had to be pulled during his time as a prisoner.

130.     On December 20, 2023, Mr. Saad returned to the United States on the same flight as the other Plaintiffs.

## II.     THE DEFENDANTS' TERORISM AGAINST THE PLAINTIFFS, DUE TO THEIR PROVISION OF MATERIAL SUPPORT MADURO.

131.     All of the Defendants have committed acts of terrorism against the Plaintiffs by means of providing material support to terrorists (Maduro). The material support occurring in the United States primarily has taken the form of (1) narcotics trafficking into Florida (and elsewhere in the United States) to provide a lucrative stream of narcotics proceeds to Maduro, (2) money laundering to, through and from Florida (and elsewhere in the United States) to conceal, cloak in "legitimacy," and or facilitate the expenditure of ill-gotten gains by Maduro, and (3) unlawfully assisting with the evasion of U.S. sanctions.

### A.     The Cartel of the Suns

132.     The key pillars of the Cartel structure are the Venezuela minister of defense (Defendant Padrino López), the deputy minister of defense, the head of the four branches of the armed forces (Army, Navy, Air Force, National Guard), the commanders of the eight strategic military zones, and the leadership of PDVSA.

#### 1.     History of the Cartel

133.     Members of the Venezuelan military became involved in the drug trade in 1990s, largely in the form of accepting bribes to ignore drug traffickers. Around 1992, Hugo Chavez formed a Venezuelan drug cartel, which at the time was known as the "Cartel Bolivariano" or "Bolivarian Cartel." In 1993, the name changed to the "Cartel of the Suns," a reference to the sun insignia on the Venezuelan military uniforms of many of the Cartel's leaders.

134.     The Venezuelan government under Hugo Chavez grew the Cartel, affording Venezuelan officials engaged in drug trafficking immunity in exchange for their loyalty to Chavez. In 2005, the Chavez government expelled the U.S. Drug Enforcement Agency ("DEA") from Venezuela, making Venezuela a more attractive route for drug trafficking. The Cartel of the Suns

began coordinating with the former FARC (the Colombian narco-terrorist rebels and, at the time, a U.S. designated foreign terrorist organization) to traffic cocaine. Venezuelan air force bases began to shelter planes loaded with cocaine that arrived from Colombia. Today, the Cartel continues to cooperate with the FARC dissidents (splinter groups that did not accept the peace in Colombia, and that remain subject to U.S. sanctions) in a similar manner.

135.    When Hugo Chavez died in 2013, Maduro stepped up to become one of the leaders of the Cartel. According to Maduro's indictment, Maduro "helped manage and, ultimately, lead the Cártel de Los Soles as he gained power in Venezuela."[65]

136.    The Venezuelan military, and by extension key members of the Cartel, face a major internal crisis because in 2019 the class of officers that graduated from officers' school in 1987, including Cabello Rondón and many of his closest allies in the Cartel such as long-time Cartel leader Defendant Padrino López, were obligated by law to retire but refuse to, causing an institutional crisis in the Cartel because it leaders now block the promotion of underclassmen to positions of power. The crisis is unresolved but has resulted in the transfer of even more power to the Cartel to head off an internal revolt.

**(a) The Cartel's Material Support for Maduro and His Terrorism.**

137.    The Cartel of the Suns, including its leaders (among them, Maduro himself, as well as Defendants Padrino López, Reverol Torres, Cabello Rondón) provides material support to Maduro and his acts of terrorism by trafficking narcotics to the United States, especially Florida, and funneling proceeds to Maduro.

---

[65] *See* Superseding Indictment, ¶ 4 *United States v. Maduro*, 11-cr-205 (S.D.N.Y. 2011) ("Maduro Indictment"), https://www.justice.gov/opa/page/file/1261806/download.

138.    As of 2022, "the Venezuelan regime and its infamous Cartel of the Suns distribute about 450 tons of cocaine out of the global cocaine market of about 1,800 tons. This would mean that the Cartel of the Suns went from a 1 percent portion of the global market in 2010 to about 25 percent today."[66] "The most recent report of nongovernmental organization Transparencia Venezuela states that drug trafficking is the number one illicit economy in the country," accounting for "profits of more than $5 billion in 2022, equivalent to 8.5 percent of the country's Gross Domestic Product."[67]

139.    The Cartel of the Suns traffics a significant portion of this cocaine in Florida.[68]

140.    U.S. Attorney Berman explained the how the Cartel of the Suns, at the behest of Maduro, provides Maduro with a rich inflow of criminal profits:

> They called their cartel the 'Cartel of the Suns.' The name they chose reflects the Cartel's identity and operations. It is a direct reference to the sun-shaped stars that Venezuelan military officers wear on their uniforms. Indeed, three former military officers of the highest rank are charged in this indictment. At the direction of Maduro, and in pursuit of their own personal profits, these officers: negotiated drug sales; protected the FARC's transportation of coca leaves from Colombia; provided safe haven in Venezuela for cocaine manufacturing facilities;    and    supplied authorization codes and cover for the planes and boats that transported the shipments as they began their journey to the United States.[69]

### 2.    Individual Defendants' Roles In Supporting The Cartel And Providing Material Support To Maduro and His Terrorism.

141.    Defendants Reverol Torres, Padrino López, Rondón Cabello, are senior figures

---

[66] *Venezuela Built Drug 'Super Cartel' to Attack US, Think Tank Says*, Dialogo Americas, (Apr. 3, 2023),   https://dialogo-americas.com/articles/venezuela-built-drug-super-cartel-to-attack-the-us-think-tank-says/.

[67] *Id.*

[68] *See* Nat'l Drug Intelligence Center, Fla. Drug Threat Assessment, (July 2003), https://www.justice.gov/archive/ndic/pubs5/5169/overview.htm.

[69] *See* Press Release, Dep't of Justice, *U.S. Attorney Geoffrey S. Berman Announces Charges in U.S. v. Maduro et al., New York, N.Y.*, (Mar. 26, 2020), https://www.justice.gov/opa/page/file/1262756/download.

within the Cartel.

142.    Assistant Attorney General Brian A. Benczkowski explained the role of Defendant

Padrino Lopez in the Cartel's narcotrafficking:

> [The Venezuelan] military—led by Padrino Lopez—was responsible for
> interdicting suspected drug traffickers flying through Venezuelan air space. But as
> Minister of Defense, Padrino Lopez instead wielded his power to allow drug
> traffickers to use Venezuela as a transshipment route for narcotics destined for the
> United States. Padrino Lopez allegedly accepted bribes from drug trafficking
> organizations to allow them free passage to fly through Venezuelan air space. So
> long as he was paid off, cocaine-filled aircraft could get by and avoid interdiction.
> Far from stopping drug traffickers, the military – for the right price – gave safe
> passage to drug traffickers, terrorists, and other criminals.[70]

143.    The United States Attorney's Office for the Eastern District of New York has

charged Defendant Torres (the former general director of Venezuela's DEA) for his role in the

Cartel's narcotics trafficking. According to the indictment, Torres "receive[d] payments from

narcotics traffickers in exchange for assisting the narcotics traffickers in conducting their illicit

drug trafficking business."[71]

144.    In exchange for payments from narcotics traffickers, Torres, among other things:

(a) alerted narcotics traffickers to future drug raids or locations of law enforcement counter-

narcotics activities so that the narcotics traffickers could change the storage locations of narcotics

or alter transportation routes or times and thus avoid detection by law enforcement; (b) stopped or

hindered ongoing narcotics investigations or counter-narcotics actions so that vehicles loaded with

narcotics could depart from Venezuela; (c) arranged for the release of individuals detained for

---

[70] *See* Press Release, Dep't of Justice, *Assistant Attorney General Brian A. Benczkowski Delivers Remarks at Press Conference Announcing Criminal Charges Against Venezuelan Officials*, (Mar. 26, 2020), https://www.justice.gov/opa/speech/assistant-attorney-general-brian-benczkowski-delivers-remarks-press-conference-announcing.

[71] *See* Indictment, *United States v. Torres*, 15-cr-20 (E.D.N.Y. Jan. 21, 2015), ¶ 4, https://www.justice.gov/doj/page/file/1261891/download.

narcotics violations or for suspicion of narcotics trafficking activities; (d) arranged for the release of seized narcotics or narcotics-related currency; and (e) prevented the arrest or deportation of individuals sought for prosecution in foreign countries, including the United States.

145.    The indictment of Defendant Diosdado Cabello—which charges him as a leader of the Cartel of the Suns and a co-conspirator, along with Maduro, in the narcoterrorism conspiracy against the United States—explains that Diosdado Cabello, among other things, "worked with other members of the Cartel de Los Soles to coordinate" "a 5.6 ton cocaine shipment from Venezuela on a DC-9 jet bearing a United States registration number."[72]

146.    The two main factions of the Cartel of the Suns, one (until recently) led by Tareck El Aissami and the other led by Diosdado Cabello, both rely on trusted family members and long-time allies to occupy key leadership positions across the government, often rotating the same person through multiple high-level positions (the Venezuelan vice presidency being one of the favorites) in short order.

147.    In 2012 El Aissami took over as governor of the strategic Aragua state, and in 2017 was named vice president of Venezuela. After a little more than a year in that post he became the powerful Minister of Industries and National Production, and served as the minister of petroleum from April 2020 until March 2023. This ministry put El Aissami in the center of the Cartel's cocaine trade and money laundering apparatus, and in a position to travel to friendly countries. In addition to the money he and his family have looted from the Venezuelan state, El Aissami handles hundreds of millions of dollars derived from the sale of cocaine, shipments of illegal gold to Turkey, and multiple other illicit revenue streams. Sources with knowledge of his activities say he controls around 40 companies that operate his money laundering structure.

---

[72] Maduro Indictment ¶ 15.d, https://www.justice.gov/opa/page/file/1261806/download.

148.    As well, other members of Maduro's network (either members or affiliates of the Cartel of the Suns) similarly have been indicted in Miami for their unlawful trafficking of narcotics:

   a.   Pedro Luis Martin-Olivares, the former Chief of Economic Intelligence for Venezuela's secret police (SEBIN), was indicted in Miami for distributing more than five kilograms of cocaine for import into the United States and possessing with the intent to distribute more than five kilograms of cocaine on board a US-registered aircraft.[73]

   b.   Rodolfo McTurk-Mora, former head of Interpol in Venezuela, was indicted in Miami for conspiring to import more than five kilograms of cocaine into the United States and to corrupt and impede the South Florida federal prosecution of another narcotics trafficker.[74]

   c.   Jesus Alfredo Itriago, the former Chief of Counter-narcotics of a main criminal investigative agency in Venezuela, was indicted in Miami for conspiring to import more than five kilograms of cocaine into the United States.[75]

**B.    PDVSA**

   **1.    Maduro's Control Over PDVSA**

149.    In 2014, Maduro appointed Carlos Erik Malpica Flores ("Malpica")—the nephew of Venezuela's First Lady—as the Vice President of Finance of PDVSA.[76] Through this act of

---

[73] See *United States v. Luis Martin-Olivares*, No. 15-cr-20299 (S.D. Fla filed Apr. 24, 2015).

[74] See *United States v. McTurk-Mora*, No. 13-cr-20930 (S.D. Fla. Filed Dec. 19, 2013).

[75] *See United States v. Itriago*, No. 13-cr-20050 (S.D. Fla. Filed Jan. 31, 2013).

[76] *See* Angus Berwick and Matt Spetalnick, *U.S. Takes Aim at the Power Behind Venezuela's Maduro: His First Lady*, Reuters (May 27, 2020) ("In 2014, PDVSA appointed a new finance director: Carlos Malpica, the third nephew of [First Lady Cilia] Flores . . . . People close to Flores

nepotism, Maduro—and his inner circle, including his wife, First Lady Flores, whom OFAC has sanctioned for her support of Maduro's corruption[77]—expanded their personal control over PDVSA. As one Venezuela expert has explained, "President [Maduro] and his inner circle directly control PDVSA."[78]

150.     Efrain Campo Flores, the nephew to First Lady Flores who was convicted of smuggling cocaine into the United States, explained in a private text message later acquired by U.S. investigators that Malpica was "the maximum authority there [i.e., PDVSA] since he's a Flores."[79] Efrain Campo Flores further explained that Malpica could help one of Efrain Campo Flores's friends collect a debt from PDVSA, although Malpica "will not do it for free."[80] In 2017, OFAC imposed sanctions on Malpica for his role in corruption at PDVSA.[81]

151.     In March 2021, the United States Executive Branch advised U.S. courts that "[Nicolas] Maduro remains in power in Venezuela, and in control of PDVSA.'"[82]

152.     As a federal court in Delaware recently explained, "[d]espite its non-recognition

---

said Malpica had become the first lady's most trusted relative, especially when it came to financial matters.")..

[77] *See* Exhibit 32, Press Release, OFAC, Treasury Targets Venezuela President Maduro's Inner Circle and Proceeds of Corruption in the United States (Sept. 25, 2018), available at https://home.treasury.gov/news/press-releases/sm495 (sanctioning Maduro's wife as one of his inner circle, and explaining that "Maduro relies on his inner circle to maintain his grip on power, as his regime systematically plunders what remains of Venezuela's wealth").

[78] Douglas Farah, *Convergence in Criminalized States: The New Paradigm, in* Beyond Convergence: World Without Order (Oct. 2016).

[79] *U.S. Takes Aim at the Power Behind Venezuela's Maduro: His First Lady*), *supra* n. 77.

[80] *Id.*

[81] *See* Exhibit 34, Press Release, OFAC Sanctions 13 Current and Former Senior Officials of the Government of Venezuela (July 26, 2017), available at https://home.treasury.gov/news/press-releases/sm0132.

[82] Exhibit 35, Trial Brief (ECF No. 80), *U.S. v. De Jongh Atencio*, Case No. 4:20-cr-00305 (S.D. Tex.), at 8.

by the U.S. government, the Maduro Regime continues (1) to exercise *de facto* control . . . over PDVSA and its assets and operations in Venezuela" and (2) to "use PDVSA as its *primary conduit for corruption*." *OI Eur. Grp. B.V. v. Bolivarian Republic of Ven.*, 663 F. Supp. 3d 406, 425 (D. Del. 2023), *aff'd*, 73 F.4th 157 (3d Cir. 2023) (emphasis added).

**2.      PDVSA Provides Material Support To Maduro By Engaging in Narcotics Trafficking Into The United States.**

153.    PDVSA plays a direct role in supporting the narcotics trafficking of Maduro and the Cartel of the Suns, through which tons of cocaine are imported into the United States each year. Among other things, PDVSA utilizes its aircraft to smuggle cocaine for the Cartel and Maduro.[83]

154.    "In January 2015, a senior Venezuelan security official defected to the United States to cooperate with U.S. authorities. The official explained that PDVSA has been using its own aircraft to move drug shipments across international borders."[84]

155.    An April 2019 Report prepared by the Foundation for Human Rights in Cuba explains "several federal agencies are keeping open a criminal investigation into a drug-trafficking

---

[83] *Top Venezuela Govt Official Accused of Drug Trafficking* (Jan. 27, 2015), Insight Crime, *available at* https://insightcrime.org/news/brief/top-venezuela-govt-official-accused-of-drug-trafficking/ ("Venezuelan state oil firm PDVSA's airplanes were sometimes used to transport drugs, with proceeds laundered through the company.").

[84] *DOJ Puts Companies With Venezuelan Ties In Its Crosshairs*, Law360 (Mar. 7, 2016), *available at* https://www.law360.com/articles/767389/doj-puts-companies-with-venezuelan-ties-in-its-crosshairs; *see also* Peter Binose, *Mount Coke, or a Mountain of Coke,* iNews (Nov. 21, 2016) ("Apparently Venezuelan government owned aircraft and that includes those belonging to the oil company PDVSA [they have a local office in Kingstown] are never searched."), *available at* https://www.ieyenews.com/peter-binose-mount-coke-or-a-mountain-of-cocaine-ask-ralph/.

and money-laundering network through which dozens of tons of cocaine are shipped weekly in at least five planes registered in the name of PDVSA."[85]

### 3. PDVSA Provides Material Support To Maduro By Laundering To and Through the United States the Proceeds of Narcotics Trafficking.

156. After Maduro appointed his wife's nephew Malpica as VP of Finance at PDVSA, PDVSA "becam[e] a massive industrial money launderer at the service of narcotrafficking."[86] "US authorities have gathered documents and eyewitness testimonies implicating officers of the state-run oil company, Petróleos de Venezuela S.A. (PDVSA), in engaging in transactions and money laundering on behalf of cocaine smugglers within the government."[87] A source familiar with the U.S. investigation into the PDVSA money laundering told the Miami Herald that "everything runs

---

[85] Juan Antonio Blanco, Rolando Cartaya, Luís Domínguez, and Casto Ocando, *Cubazuela: Chronical of a Cuban Intervention*, Foundation for Human Rights in Cuba (April 2019), at 90-91 available at https://www.fhrcuba.org/wp-content/uploads/2019/04/CUBAZUELA-CUBAN-INTERVENTION-English.pdf.

[86] *See* Angus Berwick and Matt Spetalnick, *U.S. Takes Aim at the Power Behind Venezuela's Maduro: His First Lady*, Reuters (May 27, 2020).

[87] Roger F. Noriega, *Venezuela: Rise of a Narcostate*, AEI (Aug. 11, 2015), https://www.aei.org/foreign-and-defense-policy/latin-america/venezuela-rise-of-a-narcostate/; Douglas Farah, *The Maduro Regime's Illicit Activities: A Threat to Democracy in Venezuela and Security in Latin America*, Atlantic Council at 2 (Aug. 13, 2020), https://www.atlanticcouncil.org/wp-content/uploads/2020/08/The-Maduro-Regime-Illicit-Activities-A-Threat-to-Democracy-in-Venezuela-and-Security-in-Latin-America-Final.pdf (PDVSA "launder[s] billions of dollars in illicit proceeds from the sales of cocaine, gold, and other commodities."); *The Network of Accomplices of "Narco-General" Carvajal and PDVSA's Role in Laundering*, infobae (July 25, 2014), https://www.infobae.com/2014/07/25/1583136-la-red-complices-del-narcogeneral-carvajal-y-el-papel-pdvsa-el-lavado/ (Venezuelan Colonel Julio Rodríguez Salas explained how Cartel of the Suns leader General Hugo Carvajal Barrios described the drug trafficking network and how Carvajal was key in the mechanism that allowed billions of dollars from drug sales to be laundered through PDVSA); *see also* Ricardo Guanipa D'Eizans, *PDVSA: A Major Money Laundering Operation*, Dialogo Americas (Aug. 3, 2019) ("The DEA began to suspect that the Venezuelan oil company was also being used to launder profits from narcotrafficking."), https://dialogo-americas.com/articles/pdvsa-a-major-money-laundering-operation/.

through him [Maduro]."[88]

157.     "Using PDVSA as the primary laundering vehicle," Maduro "moved money through PDVSA coffers using programs like 'oil exchanges,' fictitious massive infrastructure projects, from companies and sophisticated offshore financial structures . . . to lauder billions of dollars in illicit proceeds."[89]

158.     PDVSA launders the proceeds of Maduro and the Cartel's drug running through the United States, especially South Florida. "As I drive from my house in Miami to the U.S. Attorney's Office in downtown Miami, I can literally see the fraud and corruption of Maduro's regime — from multimillion-dollar condos on Fisher Island owned by corrupt Venezuelan executives and generals, to luxury yachts on Biscayne Bay and private jets owned by Venezuelan officials," U.S. Attorney Ariana Fajardo Orshan said.[90]

159.     The Foundation for Human Rights in Cuba elaborates:

> According to witnesses who are currently protected by the U.S. government, Cuba received up to 30 percent of the cash amounts brought in from Venezuela [on PDVSA airplanes], in exchange for making transfers to bank accounts in the United States, in order to legitimize the money earned from drug trafficking.[91]

160.     The American Enterprise Institute explains: "Venezuela's rampant corruption and money laundering schemes are integral elements of international narcotics trafficking operations.

---

[88] Jay Weaver and Antonio Maria Delgado, *Venezuela's Maduro under investigation in $1.2 billion U.S. money-laundering case*, Miami Herald (July 30, 2018).

[89] Douglas Farah, *The Maduro Regime's Illicit Activities: A Threat to Democracy in Venezuela and Security in Latin America*).

[90] Jay Weaver and Antonio Maria Delgado, *Miami Feds Seize $450 Million — Cash, Condos, Horses — in Venezuelan Corruption Cases*, Diazreus, (Apr. 27, 2020), https://diazreus.com/miami-feds-seize-450-million-cash-condos-horses-in-venezuelan-corruption-cases/.

[91] *Cubazuela: Chronical of Cuba Intervention*, *supra* n. 86, at 90.

780222892.8

. . . *Testiferros* (front men) outside the government work with officials to launder cocaine profits by," among other things, "purchasing convertible US-dollar-denominated PDVSA bonds with local currency. . . . Much of these assets are either in the United States or in dollar denominated accounts."[92]

161.     PDVSA, at its peak in the early 2000s, moved more than $100 billion a year in legitimate oil sales. The volume of money that PDVSA moved around the world for lawful purposes led Maduro and the Cartel to use PDVSA as the key hub of their multi-billion dollar money laundering system. Because PDVSA was engaging in transactions in petrodollars, its money laundering transactions cleared through the United States.

162.     As PDVSA's role in money laundering for the Cartel expanded, the Cartel— working hand-in-glove with PDVSA—became a one-stop-shop for narcotics traffickers throughout the region. Narcotics traffickers not only could purchase cocaine from the Cartel, they also could launder their ill-gotten gains through PDVSA, with PDVSA and the Cartel reaping additional profits for these money-laundering services.

163.     Because PDVSA had the backing of Maduro, and was cloaked in the (false) appearance of being a legitimate governmental enterprise, PDVSA was able to offer the Cartel and other regional narcotics traffickers stability and certainty, creating a favorable climate for unlawful business and making its services highly desirable to narcotics traffickers.

---

[92] *Venezuela: A State Destroyed by Crime and Corruption*, in Kingpins and Corruption: Targeting Transnational Organized Crime in the Americas, at 21, American Enterprise Institute: AEI Working Group on Transnational Organized Crime in the Americas (June 1, 2017), at https://www.jstor.org/stable/resrep03288.6?seq=4.

164.     By 2005 to 2008, laundering drug money has become the primary function of PDVSA. Such laundering has only increased since then, as the Venezuelan economy has continued to deteriorate.

### 4.     PDVSA Provides Material Support To Maduro By Laundering To and Through the United States the Proceeds of Currency Control Scams.

165.     One of Maduro's most profitable schemes for siphoning funds from the Venezuelan treasury into the pockets of his chosen insiders has been a currency conversion scam that takes advantage of the strict currency controls that Maduro imposes on Venezuela's official currency, the bolívar.

166.     The basics of scheme, in its simplest form, are straightforward: Maduro's cronies buy U.S. dollars on the official Venezuelan government exchange (which offers US dollars at a steep discount against the bolívar, and is accessible only to those select persons who enjoy the Maduro Regime's favor). Then, Maduro's cronies resell the U.S. dollars on Venezuela's black market at a hefty profit.

167.     In a somewhat more sophisticated version of the same type of scheme, Maduro's network started with U.S. dollars and used them to purchase "bolivares on the black market. They then gave a loan to Venezuela's state-owned oil company—Petróleos de Venezuela, S.A. ('PDVSA')—in bolivares, but PDVSA paid them back in dollars at the official exchange rate, which resulted in them having many more dollars than what they started out with. This allowed the group to increase their initial investment tenfold. The operation began in December of 2014,

and was meant to embezzle $600 million (about €534 million). By May 2015, the group had been able to double the amount to $1.2 billion (€1.07 billion)."[93]

168.    PDVSA then laundered the proceeds of such currency conversion schemes through the United States. The DOJ has explained, for example, that a former Swiss banker (who pleaded guilty to conspiracy to commit money laundering) "and members of the [Venezuelan] money laundering conspiracy used Miami, Florida real estate and sophisticated false-investment schemes to conceal that the $1.2 billion was in fact embezzled [through currency scams] from PDVSA."[94]

169.    Indeed, because much of the PDVSA money laundering of these currency control scam proceeds occurred in Florida, the United States has indicted for money laundering in this judicial district several PDVSA executives, including Abraham Edgardo Ortega, PDVSA's former Executive Director of Financial Planning, who pleaded guilty and served more than three years in federal prison.[95]

---

[93] *See* How Millions of Dirty Dollars were Laundered out of Venezuela, DW, available athttps://www.dw.com/en/how-millions-of-dirty-dollars-were-laundered-out-of-venezuela/a-47867313.

[94] Press Release, DOJ, Former Swiss Bank Executive Sentenced to Prison for Role in Billion-Dollar International Money Laundering Scheme Involving Funds Embezzled from Venezuelan State-Owned Oil Company (Oct. 29, 2018), available at https://www.justice.gov/opa/pr/former-swiss-bank-executive-sentenced-prison-role-billion-dollar-international-money.

[95] *See* Press Release, DOJ, Former Executive Director at Venezuela State-Owned Oil Company, Petroleos De Venezuela, S.A., Pleads Guilty to Role in Billion-Dollar Money Laundering Conspiracy (Oct. 31, 2018), available at https://www.justice.gov/opa/pr/former-executive-director-venezuelan-state-owned-oil-company-petroleos-de-venezuela-sa-pleads ("Abraham Edgardo Ortega, a Venezuelan national who was PDVSA's executive director of financial planning, pled guilty to one count of conspiracy to commit money laundering for his role in the billion-dollar international scheme to launder funds embezzled from PdVSA."); *see also* Criminal Complaint (ECF No. 3), *U.S. v. Guruceaga*, Case No. 1:18-cr-20685 (S.D. Fla.), (Affidavit of Special Agent of Homeland Security Investigations George F. Fernandez) at ¶ 18 ("Two years and over one hundred recordings later [our investigation] revealed an international conspiracy to launder the PDVSA funds through Miami and several large-scale, international third-party money-

170.     The affidavit from a Homeland Security investigator in the case against Ortega affirms that, from the money obtained through the PDVSA currency control scam, €159,085,876.26 went to "CHAMOS,"[96] *i.e.,* the stepsons of Maduro.[97]

### 5.     PDVSA Provides Material Support To Maduro By Assisting Him To Commit Other Act of Terrorism Against the United States

171.     PDVSA directly supported Maduro's terrorist kidnapping of the Citgo 6 by providing the airplane used for the prisoner exchange in which five members of the Citgo 6 (and one other U.S. person) were swapped for the release of Maduro's relatives, the narco nephews. In addition, accompanying the hostages on voyage was Defendant Jorge Rodriguez.

172.     PDVSA also engaged in bulk cash smuggling, flying $500,000 into the United States on one of its planes to foment violence and crime against the United States.

173.     By way of background, starting in October 2018, thousands of migrants gathered and traveled from Central America through Mexico to seek entry to the United States. This came to be known as the "migrant caravan."  U.S. Customs and Border Protection (CBP) feared that the estimated 7,000 to 10,000 members of the migrant caravan could overwhelm CBP's resources and hinder its ability to process the ordinary flow of trade and travel. Additionally, because of reports that the migrant caravan entered Mexico by force, CBP was concerned about the potential for mass

---

laundering organizations. More specifically, the investigation revealed the use of Miami real estate and sophisticated false-investment schemes to launder hundreds of millions of U.S. Dollars.").

[96] *See U.S. v. Guruceaga*, Case No. 1:18-cr-20685 (S.D. Fla.), (Affidavit of Special Agent of Homeland Security Investigations George F. Fernandez) at ¶ 109(b); *see* Factual Proffer (ECF No. 30), *U.S. v. Krull*, Case No. 1:18-cr-20682 (S.D. Fla), at ¶ 19(a) ("[A]pproximately 159 million Euros [from the PDVSA currency control scam was routed] to three individuals known as 'Los Chamos,' the stepson of 'Venezuela Official 2' [Maduro][.]").

[97] *See* Joshua Goodman, *Maduro's Stepsons Face Scrutiny in $1.2 Billion Graft Case*, AP News (Aug. 24, 2018) ("Los Chamos actually are Yoswal, Yosser and Walter Flores, the children of First Lady Cilia Flores from a previous relationship and thus Maduro's stepsons.").

illegal border crossings and violence against law enforcement when the migrant caravan reached the U.S. border.

174.     Maduro exacerbated these dangers by using ill-gotten and/or misappropriated PDVSA assets to encourage additional migrants to join the caravan. To support those efforts, PDVSA supplied an airplane and stuffed it with $500,000 in U.S. dollars in bulk cash. PDVSA then sent the plane to the United States, with the intent of utilizing the cash to further its agenda of increasing the harm the migrant caravan might cause at the U.S. border.

175.     The flight and the cash were accompanied by Defendant Jorge Rodríguez. On or about October 18, 2018, PDVSA plane with the cash landed at Fort Lauderdale-Hollywood International Airport. The United States intercepted the aircraft when it landed and impounded it at the airport, where it still remains.

### 6.     OFAC's Designation of PDVSA.

176.     On January 28, 2019, OFAC responded to the ongoing corruption and abuse at PDVSA by sanctioning the company under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.* and Executive Order 13850. *See* 84 Fed. Reg. 3282. OFAC explained that it sanctioned PDVSA to "help prevent further diverting of Venezuela's assets by Maduro."[98] OFAC stated that the "illegitimate Maduro regime has continued to use [PDVSA] as its primary conduit for corruption." *OI European Group, B.V. v. Venezuela*, 663 F. Supp. 3d 406, 425 (D. Del. 2023)

---

[98] *See* Press Release, OFAC, *Treasury Sanctions Venezuela State-Owned Oil Company Petroleos de Venezuela, S.A.,* (Jan. 28, 2019), https://www.justice.gov/usao-sdny/pr/former-venezuelan-official-hugo-armando-carvajal-barrios-extradited-united-states.

177.     A few months later, on August 5, 2019, the President through Executive Order 13884 ("E.O. 13884") blocked "all property and interest in property of the Government of Venezuela."[99] Under E.O. 13884, the term "Government of Venezuela" includes:

> [T]he state and Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and Petroleos de Venezuela, S.A. (PdVSA), any person owned or controlled, directly or indirectly, by the foregoing, and any person who has acted or purported to act directly or indirectly for or on behalf of, any of the foregoing, including as a member of the Maduro regime.[100]

178.     The decision to block PDVSA's assets, as explained in President Trump's Executive Order, was made "in light of the continued usurpation of power by Nicolas Maduro and persons affiliated with him, as well as human rights abuses," *id.*, which is precisely what Plaintiffs here suffered.

### C.     Corporacion Venezolana del Petroleo

179.     CVP is an important node in PDVSA's money laundering network for laundering, among other things, proceeds of sales of cocaine. CVP owns and/or controls—on behalf of, and in coordination with, its parent, PDVSA—numerous companies that are joint ventures between PDVSA and other Venezuelan and non-Venezuelan entities. Through, and in coordination with, such entities, CVP supports PDVSA's money laundering and Maduro's corruption, routinely leveraging the United States banking system in support of those illicit activities.

180.     For example, PetroMonagas S.A. was formed as a joint venture between CVP and Rosneft, a Russian state-controlled oil company. Given PDVSA's ownership of PetroMonagas through its subsidiary, CVP, significant control and oversight (including board representation) at

---

[99] *See* Executive Order 13884, Blocking Property of the Government of Venezuela (Aug. 5, 2019), available at https://www.federalregister.gov/documents/2019/08/07/2019-17052/blocking-property-of-the-government-of-venezuela.

[100] *Id.*

PetroMonagas originates from PDVSA and CVP leadership. Individuals heading CVP, such as Orlando Chacín (arrested in 2017 amidst a corruption purge) or the more recently appointed Marco Magallanes, exercise influence over the governance and strategic direction of JVs like PetroMonagas.

181.     The schemes in which PetroMonagas has been implicated often involve the use of opaque financial structures, shell companies, and third-party intermediaries to obscure the origin and destination of funds. In some (but by no means all) instances, PetroMonagas has been publicly implicated in various schemes to evade sanctions, launder money, and engage in corruption on behalf of Maduro, the Cartel, and the Individual Defendants.

182.     Some individuals involved in this misconduct have been prosecuted in the United States. For example, Jhonnatan Teodoro Marin Sanguino ("Marin Sanguino") served as mayor of Guanta, a port city in the oil-rich Orinoco belt of Venezuela, from in or around 2008 until in or around 2017. In April 2022, Marin Sanguino was indicted in the U.S. District Court for the Southern District of Florida for, among others crimes, money laundering.[101]  Marin Sanguino's money laundering conspiracy included "companies [that] received tens of millions of dollars in payments on contracts from the PDVSA Subsidiaries into bank accounts in South Florida."  Some of the PDVSA subsidiaries that were involved in this multi-million-dollar money laundering conspiracy in the Southern District of Florida include: PetroCedeño S.A., Petropiar S.A., PetroMonagas S.A., Petrolera Sinovensa S.A., and PetroMiranda S.A.[102]

183.     CVP is similarly affiliated with Petropiar, S.A. ("Petropiar"). Petropiar is involved in PDVSA money laundering and in Maduro's looting of the Venezuela oil assets. For example,

---

[101] *United States v. Jhonnatan Teodoro Marin Sanguino,* 22-cv-20164 (S.D. Fla. April 21, 2022).
[102] *Id.*

Rixon Rafael Moreno Oropeza ("Moreno"), a Venezuelan citizen, was indicted in the United States District Court for the Southern District of Florida on August 24, 2022, for money laundering and paying bribes to senior officials at Petropiar.[103] Moreno owned or controlled numerous companies that received contracts and funds from Petropiar in connection with the provision of supplies.[104]

184.     PetroCedeño is yet another a CVP subsidiary. PetroCedeño also plays an important role in supporting Maduro's kleptocracy and theft of assets rightfully belonging to the Venezuela people. Among other things, Maduro has pilfered hundreds of billions of dollars through the state oil monopoly over the last two decades by exaggerating production figures, inflating contract invoicing and using hand-selected contracting firms that bribed officials.

185.     Lennys Rangel was head of procurement at PetroCedeño from March 2015 to in or around December 2015.[105] During that time, Rengal received millions of dollars in bribes in exchange for assisting certain contractors (selected by senior PDVSA officials) to gain improper advantages, thereby ensuring that the contractors that paid bribes would be awarded the lucrative PetroCedeño contracts.[106]   He has been indicted in federal court in Miami for that criminal misconduct. Eduordo Orsoni, the general counsel of PetroCedeño from 2009 to 2013, (who was held other position as PDVSA and its subsidiaries from 2007 to 2018), also received millions of dollars in bribes in exchange for directing contracts to certain contractors, in accordance with

---

[103] *See* Press Release, U.S. Dep't of Justice, *Venezuelan Businessman Charged in Bribery and Money Laundering Schemes* (Aug. 22, 2022), https://www.justice.gov/archives/opa/pr/venezuelan-businessman-charged-bribery-and-money-laundering-scheme.

[104] *United States v. Rixon Rafael Moreno Oropeza*, No. 22-20391 (S.D. Fla. Aug. 24, 2022), Indictment ¶ 7.

[105] *See United States v. Rangel*, 19-cr-20726 (S.D. Fla.), ECF No. 22 (Factual Proffer), at 1.

[106] *Id.* at 2.

instructions from senior PDVSA officials.[107]  He too has been indicted in federal court in Miami for that criminal misconduct.

186.    As noted above, the contractors permitted to participate in this bribery scheme (that is, allowed to pay bribes for lucrative contracts with little to no accountability) were hand selected by senior PDVSA officials. Those choices, in turn, would have had to have been approved by Maduro, who would have benefited from the bribery scheme either monetarily (e.g., through a share of the profits earned by the selected contractors), politically (e.g., through the ability to reward cronies with lucrative opportunities to extract money from PetroCedeño), or both.

## III.    THE MADURO CRIMINAL CONSPIRACY

187.    All of the Defendants have conspired and agreed to commit a wide variety of interrelated crimes (the "Maduro Criminal Conspiracy"), including but not limited to (a) narcotics trafficking and narco-terrorism against the United States; (b) unlawful funding and provision of material support to terrorists through and from within the United States; (c) money laundering to, through and within the United States; (d) kidnapping, arbitrary detention, and torture of U.S. citizens (as well as Venezuelan citizens); and (e) public corruption offenses, bribery, embezzlement of government funds, and the like, in Venezuela.

188.    Each of Maduro Criminal Conspiracy's criminal endeavors is intrinsic to, and necessary to the functionality of, the overall criminal enterprise. Put differently, each line of criminal wrongdoing supports and reinforces the ability of the Maduro Criminal Conspiracy to commit each of the other criminal wrongdoing in which the Maduro Criminal Conspiracy engages.

189.    For example, a central objective of the Maduro Criminal Conspiracy is to assist Maduro to retain authoritarian control over Venezuela. By ensuring that Maduro unlawfully

---

[107] *See United States v. Orsoni*, 19-cr-20725 (S.D. Fla.), ECF No. 25 (Factual Proffer), at 1-3.

controls the Venezuelan state, the Maduro Criminal Conspiracy ensures that it can continue to commit profitable crimes—such as narcotics trafficking—with impunity and without interference from legitimate law enforcement in Venezuela.

190.    Conversely, the Maduro Criminal Conspiracy, through its earnings from profitable crimes such as narcotics trafficking, obtains wealth with which Maduro purchases the loyalty of Maduro Criminal Conspiracy's leaders and loyalists, thereby cementing Maduro's authoritarian control over Venezuela. "A key to Maduro's resilience has been the loyalty he has retained among most Venezuelan security forces. For years, military leaders and other officials have enriched themselves through corruption, drug trafficking, and other illicit industries."[108]

191.    In other words, dirty money is the lifeblood of the Maduro Criminal Conspiracy. As the *Washington Post* explains, "each year [the Cartel of the Suns] flies hundreds of tons of Colombian cocaine from Venezuelan airfields to Central America and the Caribbean for eventual distribution in the United States and Europe — and that [Cartel] includes some of the most senior officials in the Maduro regime. These men are not clinging to power because they are true believers in socialism . . . . They hang on because, in spite of Venezuela's economic implosion, they are still reaping millions."[109]

192.    And, through acts of terrorism and human rights abuses, the Maduro Criminal Conspiracy suppresses opposition to its narcotics trafficking, public corruption, and Maduro's authoritarian control of Venezuela.

193.    Because the foregoing crimes are interrelated, because each type of criminality

---

[108] *See* Congressional Research Service, *Venezuela, Background and U.S. Relations,* (Dec. 6, 2022), at 5, https://fas.org/sgp/crs/row/R44841.pdf.

[109] *Id*.

780222892.8

furthers the other types of criminality, and because the Maduro Criminal Conspiracy conspicuously engages in each type of criminality, each and every co-conspirator in the Maduro Criminal Conspiracy has knowingly and intentionally agreed to all types of criminality in which the Maduro RICO Enterprise engages.

## IV.    THE MADURO RICO ENTERPRISE

194.    The Maduro RICO Enterprise is an association-in-fact that includes, among others, Maduro, the Cartel of the Suns, PDVSA, CVP, and the Individual Defendants.

### COUNT I
### Violation of the Federal Anti-Terrorism Act, 18 U.S.C. § 2333
### (All Plaintiffs against Maduro For Kidnapping, Torture, and Arbitrary Detention)

195.    Plaintiffs incorporate by reference paragraphs 1 through 194 above as if fully set forth herein.

196.    Maduro violated the federal Anti-Terrorism Act ("ATA") by kidnapping, torturing, and arbitrarily detaining Mr. Kenemore, Mr. Saad, and Mr. Marval.

197.    The ATA, 18 U.S.C. § 2333, provides:

> **Action and jurisdiction.—** Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

198.    Plaintiffs Jerrel Kenemore, Jerrel Lloyd Kenemore II, Tristan Alexander Lee Kenemore, Zoe Athena Vera Lynn Kenemore, Tina Rachael Porras and Rejeana Ann Tillary, Edgar Jose Marval, Lady Stephanie Schulman Morris, SMS, MSM, and Jason Saad, as U.S. citizens, are nationals of the United States. Accordingly, they are eligible to bring a claim under the ATA.

199.    Under 18 U.S.C. § 2331 ("Definitions"), the term "International Terrorism," for

purposes of the ATA, means activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

> (B) appear to be intended—
> > (i) to intimidate or coerce a civilian population;
> > (ii) to influence the policy of a government by intimidation or coercion; or
> > (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum;

200.    Maduro's kidnapping (and false imprisonment) of Plaintiffs Jerrel Kenemore, Edgar Marval and Jason Saad were acts of terrorism.

a.  First, kidnapping (and false imprisonment) is a crime dangerous to human life.

b.  Second, the kidnapping (and false imprisonment) of Jerrel Kenemore, Edgar Marval and Jason Saad would be a criminal violation if committed within the jurisdiction of the United States or of any State, all of which prohibit kidnapping. In addition, the kidnappings violated 18 U.S.C. § 1203 ("Hostage Taking"), which imposes criminal penalties on "whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts or conspires to do so."

c.  Third, the kidnapping (and false imprisonment) of Jerrel Kenemore, Edgar Marval and Jason Saad to "appears to be intended" "to affect the conduct of a government

by mass destruction, assassination, or kidnapping," in that Maduro (1) engaged in hostage negotiations for the release of Jerrel Kenemore, Edgar Marval and Jason Saad with US government leaders, (2) determined how long to hold Mr. Kenemore, Mr. Marval, and Mr. Saad based on those negotiations, (3) made a practice of engaging in hostage diplomacy with the US government, and (4) ultimately released Mr. Kenemore, Mr. Marval, and Mr. Saad in exchange for the U.S. agreement to release Alex Saab, a Maduro insider and Venezuela criminal awaiting trial in Miami on money laundering charges at the time of his release.

d.  Fourth, the kidnapping (and false imprisonment) of Mr. Kenemore, Mr. Marval, and Mr. Saad transcends national boundaries in that Maduro utilized Mr. Kenemore, Mr. Marval, and Mr. Saad were U.S. citizens, but were kidnapped in Venezuela, and then used as bargaining chips in negotiations with the United States and ultimately agreed to swap them for the release of a Venezuelan prisoner who was incarcerated in Miami, awaiting trial for money laundering.

201.    Maduro's kidnapping (and false imprisonment) of Mr. Kenemore, Mr. Marval, and Mr. Saad was the cause of the injuries suffered by all the Plaintiffs during the time Mr. Kenemore, Mr. Marval, and Mr. Saad were arbitrarily detained, and continuing even after Mr. Kenemore, Mr. Marval, and Mr. Saad were released.

202.    Maduro's torture of Mr. Kenemore, Mr. Marval, and Mr. Saad at DGCIM headquarters in Caracas was an act of terrorism.

a.  First, torture is a crime dangerous to human life.

b.  Second, the torture of Mr. Kenemore, Mr. Marval, and Mr. Saad would be a criminal violation if committed within the jurisdiction of the United States or of

any State, all of which outlaw assault and battery.

c.   Third, the torture of Mr. Kenemore, Mr. Marval, and Mr. Saad appears to be intended to influence the policy of a government by intimidation or coercion, in that Maduro (i) attempted to elicit from Mr. Kenemore, Mr. Saad and Mr. Marval a false confession that each of them was acting as a spy for the United States, (ii) engaged in hostage negotiations for the release of Jerrel Kenemore, Edgar Marval and Jason Saad with US government leaders, (iii) determined how long to hold Mr. Kenemore, Mr. Marval, and Mr. Saad based on those negotiations, (iv) made a practice in engaging in hostage diplomacy with the US government, and (v) ultimately released Mr. Kenemore, Mr. Marval, and Mr. Saad in exchange for the U.S. agreement to release Alex Saab, a Maduro insider and Venezuela criminal awaiting trial in Miami on money laundering charges at the time of his release.

d.   Fourth, the torture of Mr. Kenemore, Mr. Marval, and Mr. Saad transcends national boundaries because Maduro (i) kidnapped those U.S. citizens in Venezuela, (ii) falsely accused them of being U.S. spies, (iii) utilized Mr. Kenemore, Mr. Marval, and Mr. Saad as bargaining chips in negotiations with the United States, (iv) exerted additional leverage on the United States by imposing additional cruelties on Mr. Kenemore, Mr. Marval, and Mr. Saad, and (v) ultimately agreed to swap them for the release of a Venezuelan prisoner who was incarcerated in Miami, awaiting trial for money laundering.

203.   Maduro's kidnapping, torture and arbitrary detention of Mr. Kenemore, Mr. Marval, and Mr. Saad was the cause of the physical and emotional injuries they suffered, as well

as the emotional and other injuries suffered by all Plaintiffs.

204.    Plaintiff Jerrel Kenemore suffered injury to his person, property and business. Among other things, he suffered from being kidnapped, tortured, and arbitrarily detained for 643 days (from March 14, 2022 to December 20, 2023).

205.    Plaintiff Jerrel Lloyd Kenemore II suffered injury to his person, property and business. Due to the kidnapping of his father Jerrel Kenemore, he suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.

206.    Plaintiff Tristan Alexander Lee Kenemore suffered injury to his person, property and business. Due to the kidnapping of his father Jerrel Kenemore, he suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.

207.    Plaintiff Zoe Athena Vera Lynn Kenemore suffered injury to her person, property and business. Due to the kidnapping of her father, Jerrel Kenemore, she suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.

208.    Plaintiff Tina Rachael Porras suffered injury to her person, property and business. Due to the kidnapping of her brother, Jerrel Kenemore, she suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.

209.    Plaintiff Rejeana Ann Tillary suffered injury to her person, property and business. Due to the kidnapping of her brother Jerrel Kenemore, she suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship,

comfort, protection, attention, advice, and counsel.

210.    Plaintiff Edgar Marval suffered injury to his person, property and business. Among other things, he suffered from being kidnapped, tortured, and arbitrarily detained for 123 days (from August 19, 2023 to December 20, 2023).

211.    Plaintiff Lady Stephanie Schulman Morris suffered injury to her person, property and business. Due to the kidnapping of her husband Edgar Marval, she suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.

212.    Plaintiff SMS suffered injury to his person, property and business due to the kidnapping of his father Edgar Marval. He suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.

213.    Plaintiff MSM suffered injury to her person, property and business. Due to the kidnapping of her father Edgar Marval, she suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.

214.    Plaintiff Jason Saad suffered injury to his person, property and business. Among other things, he suffered from being kidnapped, tortured, and arbitrarily detained for 560 days (from June 8, 2022 to December 20, 2023).

215.    Plaintiffs seek an award of compensatory damages (including treble damages) for the foregoing injuries, plus reasonable attorneys' fees and costs.

**COUNT II**
**Violation of the Federal Anti-Terrorism Act, 18 U.S.C. § 2333**
**(All Plaintiffs against All Defendants for Material Support Of Terrorism)**

216.    Plaintiffs incorporate by reference paragraphs 1 through 194 above as if fully set forth herein.

217.    Defendants violated the federal Anti-Terrorism Act ("ATA") by providing material support for the terrorism committed by Maduro.

218.    Defendants' provision of funds directly enabled the regime to expand and support its coercive apparatus (including the DGCIM) making politically motivated hostage-taking a foreseeable consequence.

219.    The Defendants' provision of material support to Maduro through the sale of narco-terrorist sales of cocaine in United States is an act of terrorism that gives rise to liability under the ATA, as is the related and laundering of profits from narco-terrorist sales of cocaine in the United States.

   a.   First, the narcoterrorism is dangerous to human life. It is dangerous to human life in the United States. *See* Maduro Indictment, ¶ 4 ("the Cartel de Los Soles, under the leadership of [Maduro] and others, prioritized using cocaine as a weapon against America"). As well, narcoterrorism is also dangerous to human life in Venezuela, because it funds the Maduro Regime's terrorism against U.S. citizens in Venezuela, such as Mr. Kenemore, Mr. Marval and Mr. Saad. "Giving money to [a terrorist], like giving a loaded gun to a child . . . is an 'act dangerous to human life.'" *Boim v. Holy Land Found.*, 549 F.3d 685, 690 (7th Cir. 2008) (en banc).

   b.   Second, the narcoterrorism violations by the Defendants violate both state and federal law prohibiting narcoterrorism and prohibiting the trafficking of drugs. In addition, because the narcoterrorism violations were intended to fund acts of

terrorism Maduro, the Defendants' trafficking also violated federal prohibitions against providing material support to terrorists.

i.   18 U.S.C. § 2339A makes it a crime to knowingly provide material support or resources knowing or intending that the funds will be used for, *inter alia*, hostage taking in violation of 18 U.S.C. § 1203 or torture of a U.S. citizen at a location outside of the United States in violation of 18 U.S.C. § 2340A. The Defendants violated Section 2339C by knowingly collecting funds (through sales of narcotics in the United States, including in Florida) for the benefit of Maduro, and knowingly providing funds (the proceeds of narcotics sales from the United States, including Florida) to Maduro, intending that Maduro would utilize the funds to further his hostage taking and torture of U.S. citizens.

ii.  18 U.S.C. § 2339C makes it a crime to knowingly provide or collect funds with the intention that the funds be used, in full or in part, to cause death or serious injury to a civilian, for the purpose of intimidating a civilian population, or for the purpose of compelling a government to take or refrain from taking an action. The Defendants violated Section 2339C by knowingly collecting funds (through sales of narcotics in the United States, including in Florida) for the benefit of Maduro, and knowingly providing funds (the proceeds of narcotics sales from the United States, including Florida) to Maduro, intending that (1) he would use the funds, in whole or in part, to cause death or injury to a civilian and (2) he would use the funds, in whole or in part, (a) to cause injury or death to a civilian (e.g., kidnapping US persons) and (b) to compel the government of the United States to provide various benefits to Maduro (such as releasing

imprisoned Venezuelan drug traffickers and money launderers who support Maduro).

c.   The violations described above appear to be intended:

  i.   to intimidate or coerce a civilian population, in that a reasonable, neutral observer would conclude that the intention behind the Defendants provision of funds (i.e., the proceeds of cocaine sales) to Maduro is to intimidate the civilian population of Venezuela; and that the intention behind the narco-terrorist sales of cocaine in the United States is to intimidate or coerce the civilian population of the United States;

  ii.   to influence the policy of a government by intimidation or coercion in that a reasonable, neutral observer would conclude (a) that the intention behind the Defendants' provision of funds (i.e., the proceeds of cocaine sales) to Maduro was to influence the policy of U.S. government, with Maduro using the funds to continue narco-terrorism in opposition to U.S. sanctions on Venezuela and to continue to kidnap U.S. citizens to extort concessions from the United States;

  iii.   to affect the conduct of a government by mass destruction, assassination, or kidnapping, in that a reasonable, neutral observer would conclude (a) that the intention behind the Defendants' provision of funds (i.e., the proceeds of cocaine sales) to Maduro was to affect the conduct of U.S. government by mass destruction, assassination, or kidnapping, with Maduro Regime using the funds to continue narco-terrorism in opposition to U.S. sanctions on Venezuela and to continue to kidnap U.S. citizens to extort concessions from the United States;

d.   The acts of terrorism described above transcend national boundaries in terms of the

means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum, in that (1) the terrorist fund raising begins with narcotics shipments from South America, continues with narcotics sales in the United States, and continues with funds being laundered through the United States and elsewhere around the globe, and ultimately with funds being repatriated to Maduro in South America, (2) the perpetrators are based in Venezuela, while the victims of narco-terrorism are located in the United States, and (3) the perpetrators of kidnapping, arbitrary detention and torture are based in Venezuela, but the concessions and relationships they seek to affect are with the United States.

220.    The Defendants' funding of terrorists, i.e., Maduro, was the cause of the injuries suffered by Plaintiffs, to their persons, property and business. The kidnapping, arbitrary detention and torture of Mr. Kenemore, Mr. Saad, and Mr. Marval were the foreseeable consequences, and a substantial factor in the sequence of responsible causation, following from the Defendants (1) raising massive amounts of funds to prop up the struggling and virulently anti-American Maduro regime and (2) funneling money to Maduro knowing that he uses funds to commit acts of terrorism including kidnapping, arbitrary detention and torture against US citizens.

221.    Plaintiff Jerrel Kenemore suffered injury to his person, property and business. Among other things, he suffered from being kidnapped, tortured, and arbitrarily detained for 643 days (from March 14, 2022 to December 20, 2023).

222.    Plaintiff Jerrel Lloyd Kenemore II suffered injury to his person, property and business. Due to the kidnapping of his father Jerrel Kenemore, he suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship,

780222892.8

comfort, protection, attention, advice, and counsel.

223.    Plaintiff Tristan Alexander Lee Kenemore suffered injury to his person, property and business. Due to the kidnapping of his father Jerrel Kenemore, he suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.

224.    Plaintiff Zoe Athena Vera Lynn Kenemore suffered injury to her person, property and business. Due to the kidnapping of her father, Jerrel Kenemore, she suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.

225.    Plaintiff Tina Rachael Porras suffered injury to her person, property and business. Due to the kidnapping of her brother, Jerrel Kenemore, she suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.

226.    Plaintiff Rejeana Ann Tillary suffered injury to her person, property and business. Due to the kidnapping of her brother Jerrel Kenemore, she suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.

227.    Plaintiff Edgar Marval suffered injury to his person, property and business. Among other things, he suffered from being kidnapped, tortured, and arbitrarily detained for 123 days (from August 19, 2023 to December 20, 2023).

228.    Plaintiff Lady Stephanie Schulman Morris suffered injury to her person, property and business. Due to the kidnapping of her husband Edgar Marval, she suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss

companionship, comfort, protection, attention, advice, and counsel.

229.     Plaintiff SMS suffered injury to his person, property and business. Due to the kidnapping of his father Edgar Marval, he suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.

230.     Plaintiff MSM suffered injury to her person, property and business. Due to the kidnapping of her father Edgar Marval, she suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.

231.     Plaintiff Jason Saad suffered injury to his person, property and business. Among other things, he suffered from being kidnapped, tortured, and arbitrarily detained for 560 days (from June 8, 2022 to December 20, 2023).

232.     Plaintiffs seek an award of compensatory damages (including treble damages) for the foregoing injuries, plus reasonable attorneys' fees and costs.

## COUNT III
## Violation of the Florida Anti-Terrorism Act, Fla. Stat. § 772.13
**(All Plaintiffs Against Maduro Kidnapping, Torture, and Arbitrary Detention)**

233.     Plaintiffs incorporate by reference paragraphs 1 through 194 above as if fully set forth herein.

234.     Florida Statute Section 772.13 provides in relevant part:

> A person who is injured by an act of terrorism as defined in § 775.30 or a violation of a law for which the penalty is increased pursuant to § 775.31 for facilitating or furthering terrorism has a cause of action for threefold the actual damages sustained and, in any such action, is entitled to . . . reasonable attorney fees and court costs in the trial and appellate courts.

235.     Plaintiffs are "persons" under Florida law. *See* Fla. Stat. § 1.01(3) (defining "person" to include "individuals, children, firms, associations, joint adventures, partnerships,

estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations.").

236.     Under Florida law, an "act of terrorism" is "[a] violent act or an act dangerous to human life which is a violation of the criminal laws of this state or of the United States," that "[i]s intended to: 1. [i]ntimidate, injure, or coerce a civilian population; 2. [i]nfluence the policy of a government by intimidation or coercion; or 3. [a]ffect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy." Fla. Stat. § 775.30.

237.    The kidnappings of Mr. Kenemore, Mr. Saad and Mr. Marval were acts of terrorism under Florida law.

   a.   First, the kidnappings of Mr. Kenemore, Mr. Saad and Mr. Marval were crimes of violence, and thus are acts dangerous to human life.

   b.   Second, the kidnappings of Mr. Kenemore, Mr. Saad and Mr. Marval were violations of the laws of the United States and Florida. The kidnappings were unlawful under 18 U.S.C. § 1203 ("Hostage Taking"). They were also criminal under Fla. Stat. § 787.01, which prohibits kidnapping with the intent to "interfere with the performance of any governmental or political function." Here, the governmental function that Maduro intended to interfere with, and did in fact interfere with, was in Florida, in that Maduro swapped the Plaintiffs for the release of Alex Saab, who was incarcerated in Miami awaiting his trial for money laundering.

   c.   Third, the kidnappings of Mr. Kenemore, Mr. Saad and Mr. Marval occurred with *mens rea* set forth in the Florida definition of terrorism. That is, the kidnappings were intended to "[i]ntimidate, injure, or coerce a civilian population," and in fact

was part of a pattern of kidnappings against the U.S. citizens designed to injure the U.S. populace. The kidnappings of Mr. Kenemore, Mr. Saad and Mr. Marval also were intended to "[i]nfluence the policy of a government by intimidation or coercion," and in fact was part of a pattern of terrorism by Maduro designed influence to policies of the government of the United States, which Maduro blamed for Venezuela's economic disaster, and which Maduro wished to punish for its sanctions against him, and moreover, specifically to affect the policy of the United States to prosecute money launderers such as Alex Saab. The kidnappings of Mr. Kenemore, Mr. Saad and Mr. Marval moreover were intended to "[a]ffect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy," in fact, were part of a pattern of kidnapping by Maduro designed influence policies of the government of the United States, which Maduro blamed for Venezuela's economic disaster, and which Maduro wished to punish for its sanctions against him, and moreover, specifically to affect the policy of the United States to prosecute money launderers such as Alex Saab.

238.    The torture of Mr. Kenemore, the torture of Mr. Saad and the torture Mr. Marval at DGCIM headquarters in Caracas were acts of terrorism.

    a. First, the torture of torture of Mr. Kenemore, the torture of Mr. Saad and the torture Mr. Marval were acts dangerous to human life.

    b. Second, the torture of Mr. Kenemore, the torture of Mr. Saad and the torture Mr. Marval were in violation of United States and Florida law because such torture occurred pursuant to, and in furtherance of, a conspiracy to engage in hostage taking and to obtain the unlawful release of Alex Saab from U.S. prison.

    c.   Third, the torture of Mr. Kenemore, the torture of Mr. Saad and the torture Mr.

Marval satisfied the *mens rea* requirements of the Florida definition of terrorism.

Those acts were intended to "[i]ntimidate, injure, or coerce a civilian population,"

and in fact was part of a pattern of terrorism by Maduro aimed at US citizens, who

he regularly tortured. As well, the torture of Mr. Kenemore, the torture of Mr. Saad

and the torture Mr. Marval were intended to "[i]nfluence the policy of a government

by intimidation or coercion," and in fact were part of a pattern of terrorism by

Maduro designed influence to policies of the government of the United States,

which Maduro blamed for Venezuela's economic disaster, and which Maduro

wished to punish for its sanctions against the Maduro Regime, and moreover,

specifically to affect the policy of the United States to prosecute money launderers

such as Alex Saab. Finally, the torture of Mr. Kenemore, the torture of Mr. Saad

and the torture Mr. Marval were intended to "[a]ffect the conduct of government

through destruction of property, assassination, murder, kidnapping, or aircraft

piracy," specifically U.S. conduct toward Alex Saab.

239.    Maduro (through his agents, following his instructions) kidnapped and tortured

Mr. Kenemore, Mr. Marval and Mr. Saad.

240.    Plaintiffs suffered the injuries described above by reason of acts of terrorism by

Maduro.

241.    Plaintiffs seek an award of compensatory damages (including treble damages) for

the foregoing injuries, plus reasonable attorneys' fees and costs.

**COUNT IV**
**Violation of the Florida Anti-Terrorism Act, Fla. Stat. § 772.13**
**(All Plaintiffs against All Defendants for Material Support Of Terrorism)**

242.    Plaintiffs incorporate by reference paragraphs 1 through 194 above as if fully set

73

forth herein.

243.    Defendants violated the Florida ATA by providing material support for the terrorism committed by Maduro.

244.    Defendants' provision of funds directly enabled the regime to expand and support its coercive apparatus (including the DGCIM) making politically motivated hostage-taking a foreseeable consequence.

245.    The Defendants' provision of material support to Maduro through the sale of narco-terrorist sales of cocaine in United States is an act of terrorism under Florida law that gives rise to liability under the Florida ATA, as is the related and laundering of profits from narco-terrorist sales of cocaine in the United States.

     a.  First, narcoterrorism is dangerous to human life. It is dangerous to human life in the United States. *See* Maduro Indictment, ¶ 4 ("the Cartel de Los Soles, under the leadership of [Maduro] and others, prioritized using cocaine as a weapon against America"). As well, narcoterrorism is also dangerous to human life in Venezuela, because it funds the Maduro Regime's terrorism against U.S. citizens in Venezuela, such as Mr. Kenemore, Mr. Marval and Mr. Saad. As well, it provides funds to Maduro. "Giving money to [a terrorist], like giving a loaded gun to a child . . . is an 'act dangerous to human life.'" *Boim v. Holy Land Found.*, 549 F.3d 685, 690 (7th Cir. 2008) (en banc).

     b.  Second, the narcoterrorism violations by the Defendants violate both state and federal law prohibiting narcoterrorism and prohibiting the trafficking of drugs. In addition, because the narcoterrorism violations were intended to fund acts of terrorism Maduro, the Defendants trafficking also violated federal prohibitions

against providing material support to terrorists.

i.    18 U.S.C. § 2339A makes it a crime to knowingly provide material support or resources knowing or intending that the funds will be used for, *inter alia*, hostage taking in violation of 18 U.S.C. § 1203 or torture of a U.S. citizen at a location outside of the United States in violation of 18 U.S.C. § 2340A. The Defendants violated Section 2339C by knowingly collecting funds (through sales of narcotics in the United States, including in Florida) for the benefit of Maduro, and knowingly providing funds (the proceeds of narcotics sales from the United States, including Florida) to Maduro, intending that Maduro would utilize the funds to further his hostage taking and torture of U.S. citizens.

ii.   18 U.S.C. § 2339C makes it a crime to knowingly provide or collect funds with the intention that the funds be used, in full or in part, to cause death or serious injury to a civilian, for the purpose of intimidating a civilian population, or for the purpose of compelling a government to take or refrain from taking an action. The Defendants violated Section 2339C by knowingly collecting funds (through sales of narcotics in the United States, including in Florida) for the benefit of Maduro, and knowingly providing funds (the proceeds of narcotics sales from the United States, including Florida) to Maduro, intending that (1) he would use the funds, in whole or in part, to cause death or injury to a civilian and (2) he would use the funds, in whole or in part, (a) to cause injury or death to a civilian (e.g., kidnapping US persons) and (b) to compel the government of the United States to provide various benefits to Maduro (such as releasing imprisoned Venezuelan drug traffickers and money launderers who support

75

Maduro).

c.  Third, Defendants conduct meets the mens rea requirement of the definition of terrorism under Florida law.

   i.  The provision of narcotrafficking and narcoterrorism proceeds to Maduro was intended to "[i]ntimidate, injure, or coerce a civilian population," including the civilian population of Venezuela, a population that Defendants wanted Maduro to intimidate so that they would not oppose or interfere with their lucrative narcotics trafficking, and the civilian population of the United States, a population that Defendants knew was being injured through the ongoing narcoterrorism that was yielding billions of dollars for Maduro.

   ii.  The provision of narcotrafficking and narcoterrorism proceeds to Maduro was intended to influence the policy of a government by intimidation or coercion, in that Defendants knew that Maduro would utilize the funds to continue narco-terrorism in opposition to U.S. sanctions on Venezuela and to continue to kidnap U.S. citizens to extort concessions from the United States;

   iii.  The provision of narcotrafficking and narcoterrorism proceeds to Maduro was intended to "[a]ffect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy," in the Defendants knew and intended that Maduro would use the proceeds to continue to kidnap U.S. citizens to coerce conduct by the U.S. government that would support the continuation of narcotrafficking and narcoterrorism, such as the release of prisoners such as Alex Saab.

246.    The Defendants' funding of terrorists, i.e., Maduro, was the cause of the injuries

suffered by Plaintiffs. The kidnapping, arbitrary detention and torture of Mr. Kenemore, Mr. Saad, and Mr. Marval were the foreseeable consequences, and a substantial factor in the sequence of responsible causation, following from the Defendants (1) raising massive amounts of funds to prop up the struggling and virulently anti-American Maduro regime and (2) funneling money to Maduro knowing that he uses funds to commit acts of terrorism including kidnapping, arbitrary detention and torture against US citizens.

247.     Plaintiffs seek an award of compensatory damages (including treble damages) for the foregoing injuries, plus reasonable attorneys' fees and costs.

**COUNT V**
**Conspiracy**
**(By All Plaintiffs Against All Defendants)**

248.     Plaintiffs incorporate by reference paragraphs 1 through 194 above as if fully set forth herein.

249.     All of the Defendants agreed to the Maduro Criminal Conspiracy to perform unlawful acts including (a) narcotics trafficking; (b) narco-terrorism and other terrorism against the United States and its citizens; (c) acts of terrorism including kidnapping and torture against the United States and citizens; and (d) money laundering.

250.     The kidnapping, torture and arbitrary detention of Mr. Kenemore, Mr. Marval and Mr. Saad were overt acts in furtherance of that Maduro Criminal Conspiracy.

251.     Plaintiffs seek an award of compensatory damages for the foregoing injuries, the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future, and reasonable attorneys' fees and costs.

**COUNT VI**
**Federal Civil RICO, 18 U.S.C. § 1964(c)**
**(By All Plaintiffs Against All Defendants)**

252.     Plaintiffs incorporate by reference paragraphs 1 through 194 above as if fully set

77

forth herein.

253.     RICO, 18 U.S.C. § 1962(c), makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . " 18 U.S.C. § 1962(c).

254.     ***Persons***. Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3), and therefore each Defendant has capacity to violate RICO, 18 U.S.C. § 1962(c), which applies to such "persons."

255.     ***The Enterprise***. Maduro, the Cartel of the Suns, PDVSA and the Individual Defendants form an association-in-fact (the "Maduro RICO Enterprise") for the common and continuing purpose described here, i.e., for purpose of supporting Maduro's exercise of unlawful authoritarian control over Venezuela, furthering the Maduro Criminal Conspiracy and engaging in criminal acts including but not limited to: (a) narcotics trafficking; (b) acts of terrorism including but by no means limited to narco-terrorism; (c) human rights violations including kidnapping, torture, and murder; (d) public corruption offenses; and (e) money laundering.

256.     The Maduro RICO Enterprise constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. The members of the enterprise functioned as continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. The Maduro RICO Enterprise is the poster child for what Congress had in mind when it created a civil RIDCO remedy: a well-organized, long standing, hierarchical crime syndicate engaged in myriad violent criminal endeavors.

257.     In the alternative Maduro's unlawful de facto "government in Venezuela (the

"Maduro Regime"), the Cartel of Suns, and PDVSA each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Alternative Enterprises").

258. ***Interstate and Foreign Commerce***. The Maduro RICO Enterprise and the Alternative Enterprises have engaged in, and their activities have affected, interstate and foreign commerce.

259. ***Pattern of Racketeering Activity***. Defendants, each of whom are persons associated with, or employed by, the Maduro RICO Enterprise and/or the Alternative Enterprises, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and l962(c). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

260. Defendants each committed at least two predicate acts of racketeering activity that are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1), as more specifically alleged below.

261. The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous. There was repeated conduct during a period of time beginning in 2013 (when Maduro became President of Venezuela following the death of Hugo Chavez), if not sooner, and continuing to the present. Moreover, there is a continued threat of repetition of such conduct.

262. Plaintiffs specifically allege that Defendants participated in the operation and management of the Maduro RICO Enterprise and the Alternative Enterprises by overseeing and

coordinating the commission of multiple acts of racketeering as described below.

263.     ***Predicate: Conspiracy to commit narco-terrorism (All Defendants)***. RICO predicates include "any offense involving . . . the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance." See 18 U.S.C. § 1961. Defendant Maduro committed acts indictable for offenses "involving the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance," and in fact has been indicted for a narco-terrorism conspiracy beginning in 1999 and continuing through today, in violation of 21 U.S.C. § 960a, the object of which was to violate 21 U.S.C. § 841(a) (distribution of five kilograms or more of cocaine), "knowing and intending to provide, directly and indirectly, something of pecuniary value to a person and organization that has engaged and engages in terrorism and terrorist activity." Maduro committed this offense in conspiracy with Individual Defendants.

264.     ***Predicate: Cocaine importation conspiracy (All Defendants)***. RICO predicates include "any offense involving  . . ." the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance." See 18 U.S.C. § 1961. Defendant Maduro committed acts indictable for offenses "involving the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance," and in fact has been indicted for a cocaine importation conspiracy that began in 1999 and continues through today, including importing cocaine into the United States from abroad in violation of 21 U.S.C. § 952(a) and 21 U.S.C. § 960(a)(1), and including manufacturing, distributing and possessing with intent distribute cocaine knowing, and having reasonable cause to believe that the cocaine would be unlawfully imported in the United States, in violation of 21 U.S.C. § 959(a) and 21 U.S.C. § 960(a)(3), and possessing cocaine with intent to distribute on

board an aircraft registered in the United States in violation of 21 U.S.C. § 959(c) and 21 U.S.C. § 960(a)(3). Maduro committed this offense in conspiracy with the Individual Defendants.

265.     ***Predicate: Conspiracy to commit kidnapping (All Defendants)***. RICO predicates include "any act or threat involving murder [or] kidnapping . . . which is chargeable under State law and punishable by imprisonment for more than one year." See 18 U.S.C. § 1961. Conspiracy to commit kidnapping is an act involving kidnapping that is chargeable under State law (including the law of Florida) and punishable by imprisonment of more than a year. The Defendants conspired to kidnap Mr. Kenemore, Mr. Marval and Mr. Saad. That conspiracy is chargeable in Florida and conduct constituting an element of the offense occurred in Florida. Specifically, overt acts in furtherance of the conspiracy  occurred  in  Florida, in that object of the kidnapped was to obtain the release of Alex Saab, who was incarcerated in Florida and Mr. Saab was release from prison in Florida in exchange for the kidnap victims. The Defendants were all members of the conspiracy to kidnap Mr. Kenemore, Mr. Marval and Mr. Saad.

266.     ***Predicate: Money Laundering Violations (PDVSA, Maduro, Padrino López, Moreno Perez , Torres, El Aissami, Delcy Rodriguez, Alex Saab).*** RICO predicates include criminal money laundering in violation of 18 U.S.C. § 1956 and 18 U.S.C. § 1957. Defendants launder the proceeds of Maduro and the Cartel's drug running through the United States, especially South Florida. Defendants also launder the proceeds of crimes against a foreign nation, including crimes against Venezuela such as sale and distribution of controlled substances, murder, kidnapping, and embezzlement of public funds for the benefit of a public official.

267.     ***Predicate: Obstruction of justice (Maduro, Jorge Rodriguez)***. RICO predicates include obstruction of justice, in violation of 18 U.S.C. § 1503, which imposes criminal liability upon "[w]hoever . . . corruptly or by threats or force, or by any threatening letter or communication,

influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice." Defendants, by kidnapping U.S. citizens including Plaintiffs, to help criminals, including Alex Saab and the narco-nephews evade U.S. justice, committed the predicate act of obstruction of justice.

268.     **Predicate: Robbery (Maduro).** Racketeering activity includes "any act or threat involving . . . robbery as well as any robbery in violation of 18 U.S.C. § 1951. Defendants committed such robbery when they took Mr. Marval's phone by force and used it to access his U.S. bank accounts without authorization and to steal the money contained therein.

269.     **Predicate: Travel Act violations (All Defendants)**. Violations of the Travel Act, 18 U.S.C. § 1952, are RICO predicate offenses. Under the Travel Act, it is unlawful to use "any facility of interstate or foreign commerce" (which includes any "means of communication," *see* 18 U.S.C. § 1958(b)(2)) to "promote, manage, establish, carry on or facilitate the promotion, management, establishment and carrying on, of any unlawful activity" or to "commit any crime of violence to further unlawful activity." The Travel Act defines the term "unlawful activity" to include, among other things, "any business enterprise involving . . . narcotics or controlled substances." *Id*. § 1952(b)(1). Here, Defendants committed offenses indictable under the Travel Act because they used a facility of interstate or foreign commerce to promote, carry on or facilitated an unlawful activity (i.e., their narcotics trafficking business).

270.     **Continuity of Conduct**. Defendants' violations of state and federal law as set forth herein, each of which directly and proximately injured Plaintiffs, constituted a continuous course of conduct spanning a period from at least 2013 to the present, which was intended to obtain money through narcoterrorism, narcotics trafficking, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. § 1961(l) and (5).

271.     ***Conduct of Affairs***. Defendants have conducted and participated in the conduct of the affairs of the Maduro RICO Enterprise and the Alternative Enterprises through a pattern of racketeering activity as alleged above in violation of 18 U.S.C. § 1962(c).

272.     ***Proximate cause and damages to business and property***. The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to the Plaintiffs in their business or property. Plaintiff seeks an award of damages in compensation for, among other things, the property that Defendants stole from Mr. Kenemore, Mr. Saad, and Mr. Marval when they were kidnapped, the destruction of Mr. Saad's jewelry business, economic costs that Defendants imposed upon the Kenemore family and the Marval family as they struggled to obtain the freedom of Mr. Kenemore and Mr. Marval, and the money in Mr. Marval's bank accounts that the Defendants electronically stole when they robbed his cell phone from him, to access those accounts. In addition, Mr. Marval owned a variety of businesses (including one selling and renting heavy machinery, another trading metals, and a freight forwarder), that suffered economic losses due to the fact that Mr. Marval was not available to operate the business while he was in captivity.

273.     Plaintiffs seek an award of compensatory damages (including treble damages) for the foregoing injuries, plus reasonable attorneys' fees and costs.

## COUNT VII
## Conspiracy to Violate Federal Civil RICO, 18 U.S.C. § 1962(d)
### (By All Plaintiffs Against All Defendants)

274.     Plaintiffs incorporate by reference paragraphs 1 through 194 above as if fully set forth herein.

275.     In violation of 18 U.S.C. § 1962(d), Defendants, and each of them, knowingly, willfully, and unlawfully conspired to facilitate a scheme which included the operation or management of a RICO enterprise through a pattern of racketeering activity as alleged above.

276.    The conspiracy commenced at least as early as 2013 and is ongoing.

277.    The conspiracy's purpose is to exercise unlawful authoritarian control over Venezuela, further the Maduro Criminal Conspiracy, and engage in (a) narcotics trafficking; (b) acts of terrorism including but by no means limited to narco-terrorism; (c) human rights violations including kidnapping, torture, and murder; (d) public corruption offenses; and (e) money laundering.

278.    Each Defendant committed at least one overt act in furtherance of such conspiracy. These acts in furtherance of the conspiracy included kidnapping, torturing and arbitrary detention of Mr. Kenemore, Mr. Marval and Mr. Saad, communicating in foreign and/or interstate commerce in support of such kidnapping, stealing the property of Mr. Kenemore, Mr. Marval and Mr. Saad, destroying the businesses of Mr. Kenemore, Mr. Marval and Mr. Saad, and imposes economic costs on the Kenemore family and the Marval family as they undertook efforts to free their loved ones.

279.    Even if some of the Defendants did not agree to harm Plaintiffs specifically, the purpose of the acts they engaged in was to advance the overall object of the conspiracy, and the harm to Plaintiffs was in furtherance of the conspiracy.

280.    Plaintiffs have been injured and continue to be injured in their business and property by Defendants' conspiracy in violation of 18 U.S.C. § 1962(d). The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiffs in their business and property.

281.    Plaintiffs seek an award of compensatory damages (including treble damages) for the foregoing injuries, plus reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that the Court grant:

      A.     An award of compensatory damages, consequential damages, and treble damages.

      B.     An award of attorneys' fees, costs, and expenses.

      C.     A jury trial on all issues so triable.

      D.     Such other relief as is just and proper.

Respectfully submitted on August 14, 2025.

| /s/  Jaime D. Guttman | /s/  Alex C. Lakatos |
|---|---|
| Fla. Bar No. 44076 | D.C. Bar. No. 453763 |
| jaime@scale.law | *Pro Hac Vice forthcoming* |
| Scale Law Partners, LLC | alakatos@mayerbrown.com |
| 777 Brickell Avenue, Suite 500 | Mayer Brown LLP |
| Miami, FL  33131 | 1999 K Street NW |
| (786) 273-9033 (Main) | Washington, DC  20006 |
| | (202) 263-3000 (Main) |

780222892.8