**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE No. 25-cv-23652-GAYLES/TORRES**

**JERREL KENEMORE, et al.,**

      **Plaintiffs,**

**vs.**

**NICOLAS MADURO MOROS, et al.,**

      **Defendants.**

_____ /

**ORDER GRANTING PLAINTIFFS' MOTION FOR**
**FINAL DEFAULT JUDGMENT AS TO MADURO, THE INDIVIDUAL**
**DEFAULTING DEFENDANTS, AND THE CARTEL OF THE SUNS**

THIS CAUSE came before the Court upon Plaintiffs' Motion for Final Default Judgment (the "Motion") as to Nicolas Maduro Moros ("Maduro"); The Cartel of the Suns a/k/a Cartel de los Soles (the "Cartel"); Vladimir Padrino Lopez ("Padrino Lopez"); Maikel Jose Moreno Perez ("Moreno Perez"); Nestor Luis Reverol Torres ("Reverol Torres"); Tarek William Saab ("Tarek Saab"); Diosdado Cabello Rondón ("Cabello Rondón"); and Alex Nain Saab Moran ("Alex Saab") (the "Individual Defaulting Defendants," and together with Maduro and the Cartel, the "Defaulting Defendants"), filed pursuant to Federal Rule of Civil Procedure 55(b)(2). [ECF No. 30]. The Court, having reviewed the Motion, the Complaint [ECF No. 1], the Clerk's Entries of Default [ECF Nos. 20, 26], the record, and the applicable law and being otherwise fully advised, hereby GRANTS the Motion.

This Order resolves the Motion solely as to the Defaulting Defendants. Nothing in this Order adjudicates or decides Plaintiffs' claims with respect to Defendants Petroleos de Venezuela,

1

S.A. ("PDVSA"), Corporacion Venezolana del Petroleo ("CVP"), Delcy Eloina Rodriguez Gomez, or Jorge Jesus Rodriguez Gomez (collectively, the "Non-Defaulting Defendants").

## FINDINGS OF FACT

By their default, the Defaulting Defendants are deemed to have admitted the well-pleaded factual allegations of the Complaint. *See Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009); *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1278 (11th Cir. 2005). Based on those admitted allegations and the record, the Court finds as follows.

### A.    Plaintiffs, The Defaulting Defendants, and the Procedural History

Plaintiffs Jerrel Kenemore, Rejeana Ann Tillery, Jerrell Lloyd Kenemore II, Tristan Alexander Lee Kenemore, Zoe Athena Vera Lynn Kenemore, and Tina Rachel Porras (the "Kenemore Family"); Edgar Jose Marval, Lady Stephanie Schulman Morris, SMS (a minor), and MSM (a minor) (the "Marval Family"); and Jason Saad have at all relevant times been nationals and citizens of the United States. Compl. ¶¶ 9–19. Plaintiffs filed their Complaint on August 14, 2025, asserting claims under the federal Anti-Terrorism Act (the "ATA"), 18 U.S.C. § 2333; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964; the Florida Anti-Terrorism Act (the "Florida ATA"), Fla. Stat. § 772.13; and Florida common law (Conspiracy).

On November 11, 2025, the Court appointed the U.S. Marshals Service as Special Process Server to effectuate service upon the Cartel. [ECF No. 6]. The U.S. Marshals Service completed service on the Cartel on November 25, 2025 by serving Cliver Cardones, a senior officer and leader of the Cartel imprisoned in the United States. [ECF No. 15]. The Cartel failed to respond, and the Clerk entered a default against the Cartel on December 19, 2025. [ECF No. 20].

On December 5, 2025, the Court granted Plaintiffs' Expedited Motion for Alternative Service under Federal Rule of Civil Procedure 4(f)(3) and 28 U.S.C. § 1608(b), [ECF No. 14], and on December 10, 2025, Plaintiffs served the remaining Defaulting Defendants in compliance with that Order, [ECF No. 17]. Maduro and the Individual Defaulting Defendants failed to plead or otherwise defend, and on January 4, 2026, the Clerk entered defaults against Maduro, Padrino Lopez, Moreno Perez, Reverol Torres, Tarek Saab, Cabello Rondón, and Alex Saab. [ECF No. 26].

### B.   Maduro's Narcoterrorism Against the United States

For at least twenty years, Maduro intentionally inundated the United States with tons of cocaine, both to enrich himself and to harm the United States and its citizens. Much of the cocaine trafficked by Maduro entered the United States through South Florida. Compl. ¶ 55. On March 26, 2020, the U.S. Department of Justice unsealed indictments charging Maduro and other Venezuelan leaders with narcotics trafficking and narcoterrorism. On January 3, 2026, the Department of Justice filed a superseding indictment against Maduro. Compl. ¶ 57; *United States v. Maduro*, No. 11-cr-205 (S.D.N.Y.). As of 2022, Maduro and the Cartel of the Suns distributed approximately 450 tons of cocaine out of a global cocaine market of approximately 1,800 tons, a significant portion of which the Cartel trafficked in Florida. Compl. ¶¶ 138–139.

### C.   Maduro's Practice of Hostage Diplomacy and the Motive to Free Alex Saab

Maduro has historically kidnapped and arbitrarily detained U.S. citizens to barter them for the release of Venezuelan criminals held in the United States, including the 2022 exchange of the "Citgo Six" and others for the so-called "narco nephews." Compl. ¶¶ 59–63. On or about October 16, 2020, Alex Saab—a key money launderer for the Defaulting Defendants—was extradited to the United States to face charges including money laundering and was incarcerated in Miami,

3

Florida, pending trial. Because Alex Saab's cooperation could expose Maduro's money laundering and sanctions-evasion networks, Maduro launched a campaign to kidnap U.S. citizens who could be swapped for Alex Saab's release. Compl. ¶¶ 64–66.

### D.   The Kidnapping and Torture of Jerrel Kenemore (643 Days)

On March 17, 2022, Mr. Kenemore was turned over to Venezuelan authorities and then to the Directorate General of Military Counterintelligence ("DGCIM"), which at all relevant times reported directly to Maduro as de facto commander-in-chief and administratively to Padrino Lopez as de facto Minister of Defense. Maduro directly authorized and instructed the DGCIM to kidnap and abuse U.S. citizens, including Mr. Kenemore. Compl. ¶¶ 67, 81, 84.

The DGCIM held Mr. Kenemore at its La Maxima II facility in Caracas for 643 days, until his release on December 20, 2023. During that captivity, Mr. Kenemore was subjected to the denial of food, water, and medicine; provision of unsanitary water and spoiled food; denial of light; forced isolation; forced inhalation of paint and gasoline fumes; and other forms of physical and psychological torture, including being made to witness fellow prisoners tortured with electric shocks. As a result, Mr. Kenemore twice attempted suicide. Compl. ¶¶ 85–88. Mr. Kenemore continues to suffer severe and lasting physical and psychological injuries, including panic attacks, severe anxiety, nightmares, chronic insomnia, symptoms consistent with agoraphobia, depression, survivor's guilt, nerve and ligament damage to his hands and wrists, permanent injury to his left shoulder, and stomach ulcers. Compl. ¶ 96.

Mr. Kenemore's captivity inflicted profound emotional injury upon his family. His sisters, Rejeana Ann Tillery and Tina Rachel Porras, and his children, Jerrell Lloyd Kenemore II, Tristan Alexander Lee Kenemore, and Zoe Athena Vera Lynn Kenemore, each suffered severe depression, anxiety, nightmares, insomnia, and related harms. Compl. ¶¶ 97–98.

### E.  The Kidnapping and Torture of Edgar Marval (123 Days)

Plaintiffs (and other prisoners with whom they were held captive) generally agree that, as bad as things were for them, the situation was decidedly worse for Mr. Marval. Compl. ¶ 101. During his captivity, Mr. Marval was beaten brutally and repeatedly by a sadistic DGCIM officer who broke his back. Mr. Marval was tortured with electric shocks, including to his genitals, and subjected to psychological torture, including threats that his children would be taken from him. The DGCIM confiscated his cell phone, tortured him until he revealed his passwords, and used the phone to withdraw his life savings from his U.S. bank accounts. Compl. ¶¶ 101–104, 106.

Maduro's agents unlawfully confiscated property that Mr. Marval's wife, Plaintiff Lady Stephanie Schulman Morris, owned in Venezuela, including a home and an interest in two pharmacies. Compl. ¶ 107. While Mr. Marval was detained, DGCIM agents telephoned Ms. Schulman Morris, described their abuse of Mr. Marval, and demanded money to refrain from killing him. As a result of her husband's detention, torture, and the Defaulting Defendants' agents' extortion and threats, Ms. Schulman Morris suffered (and continues to suffer) anxiety, depression, insomnia, tremors, and dramatic physical deterioration, losing more than ten kilograms in a matter of weeks. The Marval children (Plaintiffs SMS and MSM) suffered (and continue to suffer) anxiety, insomnia, terrors, and a constant feeling of persecution. Compl. ¶¶ 110–112.

### F.  The Kidnapping and Torture of Jason Saad (560 Days)

On June 8, 2022, Mr. Saad was kidnapped by armed DGCIM agents, who handcuffed him, placed a bag over his head, hogtied him, and held him incommunicado. He was placed in a stress position that nearly broke his shoulder and ripped the tendons in his arm and was thereafter held largely in solitary confinement. Compl. ¶¶ 118–125.

Mr. Saad was denied medical care for his injured shoulder and for a rash caused by unsanitary conditions, and two of his infected teeth had to be pulled while he was imprisoned. Mr. Saad was held for 560 days. Compl. ¶ 129.

### G. The Cartel and the Individual Defaulting Defendants' Material Support for Maduro's Terrorism

The Cartel of the Suns is an unincorporated association whose leadership includes Maduro, Padrino Lopez, Reverol Torres, and Cabello Rondón. The Cartel provided material support to Maduro's acts of terrorism by trafficking narcotics into the United States, especially Florida, and funneling the proceeds to Maduro. Compl. ¶¶ 21, 132–139.

Vladimir Padrino Lopez is the de facto Minister of Defense of Venezuela and one of the most senior leaders of the Cartel. He was sanctioned by OFAC and indicted in the U.S. District Court for the District of Columbia for conspiring to distribute cocaine. The DGCIM that kidnapped and tortured the Plaintiffs reported to him. Compl. ¶¶ 24, 67, 132, 142.

Maikel Jose Moreno Perez, at all relevant times a Justice and former Chief Justice of the Venezuelan Supreme Court, was sanctioned by OFAC and criminally charged in this District with money laundering in connection with the corrupt receipt of bribes largely originating from South Florida accounts. Compl. ¶ 25.

Nestor Luis Reverol Torres, a senior member of the Cartel, was sanctioned by OFAC and indicted by the Department of Justice for offenses including trafficking and distributing cocaine. Compl. ¶¶ 26, 143–144.

Tarek William Saab, at all relevant times the de facto Attorney General of Venezuela, was sanctioned by OFAC for undermining democracy in Venezuela and has been sanctioned by other countries for human rights violations. Compl. ¶ 27.

Diosdado Cabello Rondón, the de facto Minister for Interior, Justice, and Peace of Venezuela and a leader of the Cartel, was sanctioned by OFAC for exploiting his official position to engage in narcotics trafficking and money laundering and was indicted for narco-terrorism conspiracy in the same indictment charging Maduro. Compl. ¶¶ 28, 136.

Alex Saab was indicted in this District for conspiracy to commit money laundering in connection with a scheme involving at least $350 million in wire transfers and served as a financier and money launderer for Maduro and the Cartel. On or about October 16, 2020, he was extradited to the United States.

### H.    The Prisoner Exchange

On December 20, 2023, the United States agreed to release Alex Saab in exchange for Maduro's release of ten U.S. citizen hostages, including Plaintiffs Jerrel Kenemore, Edgar Marval, and Jason Saad. The released hostages were flown to St. Vincent and the Grenadines, where the exchange occurred. Compl. ¶¶ 94–95.

### I.    The Maduro Criminal Conspiracy and the Maduro RICO Enterprise

The Defaulting Defendants agreed and conspired to commit a series of interrelated crimes (the "Maduro Criminal Conspiracy"), including narcotics trafficking and narco-terrorism against the United States; the unlawful provision of material support to terrorists through and from within the United States; money laundering to, through, and within the United States; and the kidnapping, arbitrary detention, and torture of U.S. citizens. Each line of criminal conduct reinforced Maduro's authoritarian control over Venezuela, which in turn enabled the enterprise to commit its profitable crimes with impunity. Compl. ¶¶ 187–189.

The Maduro RICO Enterprise is an association-in-fact enterprise that includes, among others, Maduro, the Cartel, and the Individual Defaulting Defendants. It functioned as a continuing

unit with the common purpose of, among other things, flooding the United States with cocaine, laundering the proceeds, and violently suppressing opposition and committed predicate acts including (a) conspiracy to commit narcoterrorism (b) conspiracy to import cocaine, (c) conspiracy to commit kidnapping,  (d) money laundering, (e) obstruction of justice, (f) robbery, and (g) Travel Act violations. *Id.* at ¶¶ 194, 255–256, 263-269, 270.

**CONCLUSIONS OF LAW**

### A.   Legal Standard for Default Judgment

Federal Rule of Civil Procedure 55(b)(2) authorizes the entry of a final default judgment against a party who has failed to plead or otherwise defend. The Clerk's entry of default constitutes an admission of all well-pleaded factual allegations in the Complaint. *Cotton*, 402 F.3d at 1278. Where the Court may exercise personal jurisdiction and the Plaintiffs have stated a claim for relief, entry of a default judgment is appropriate. *See Marron v. Maduro*, No. 21-23190, 2023 WL 357592, at *2 (S.D. Fla. Jan. 23, 2023).

### B.   Subject Matter Jurisdiction

The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under (a) the ATA, 18 U.S.C. § 2333, and (b) RICO, 18 U.S.C. § 1964. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the Florida Anti-Terrorism Act and state-law conspiracy claims, which arise from the same nucleus of operative facts as the federal claims.

### C.   Personal Jurisdiction

The Defaulting Defendants were properly served. Service upon the Cartel, an unincorporated association, was effected under Federal Rule of Civil Procedure 4(h)(1)(B) by serving its leader, Cliver Cardones. *See Alban Osio v. Maduro Moros*, No. 21-cv-20706, 2023 WL 5019877, at *4 (S.D. Fla. July 19, 2023), *report and recommendation adopted* 2023 WL 5015435,

at * (S.D. Fla. Aug. 7, 2023). Maduro and the Individual Defaulting Defendants were served by Court-authorized alternative means under Rule 4(f)(3) and 28 U.S.C. § 1608(b), which satisfies due process. [ECF Nos. 14, 17].

The Court has personal jurisdiction over the Defaulting Defendants under Florida's long-arm statute, Fla. Stat. § 48.193(1)(a)(2), because the Defaulting Defendants and their co-conspirators committed tortious acts in Florida giving rise to Plaintiffs' claims, including trafficking narcotics through Florida to fund Maduro's terrorism and leveraging the kidnapping of Plaintiffs to obtain the release of Alex Saab, who was incarcerated in and released from Florida. Florida's long-arm statute further reaches each Defaulting Defendant as a co-conspirator because acts in furtherance of the conspiracy occurred in Florida. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1281 (11th Cir. 2009).

The exercise of personal jurisdiction comports with due process. Because Plaintiffs' claims arise under federal law, the Fifth Amendment supplies a flexible inquiry satisfied where the challenged conduct is closely related to the United States and implicates important national interests. *See Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 15-16 (2025). The kidnapping of U.S. citizens to swap for a criminal incarcerated in the United States readily meets that standard and also satisfies the Eleventh Circuit's traditional minimum-contacts test. So too does the theft of Mr. Marval's life savings from his bank accounts in Florida.

### D.   Venue

Venue is proper in this District under 18 U.S.C. § 2334(a) because several Plaintiffs reside in this District. Compl. ¶¶ 9, 11, 12.

### E.    Liability Under the Anti-Terrorism Act (18 U.S.C. § 2333)

The ATA authorizes any U.S. national injured in his or her person, property, or business by reason of an act of international terrorism to sue and recover threefold the damages sustained, plus costs and attorney's fees. 18 U.S.C. § 2333(a); *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 477–78 (2023). Plaintiffs are U.S. nationals. Compl. ¶¶ 9–19.

Maduro committed acts of international terrorism as defined in 18 U.S.C. § 2331(1). His kidnapping, torture, and arbitrary detention of Mr. Kenemore, Mr. Marval, and Mr. Saad violated the criminal laws of the United States and Florida, including 18 U.S.C. § 1201 (kidnapping), 18 U.S.C. § 2340A (torture), 18 U.S.C. § 1203 (hostage taking), and Fla. Stat. § 787.02 (false imprisonment). It is self-evident that these acts were dangerous to human life. The actions also appeared intended to affect the conduct of the U.S. Government by kidnapping, in that Maduro engaged in hostage negotiations and ultimately traded the Plaintiffs for Alex Saab. And Maduro's terrorism transcended national boundaries, including in its funding through international narcotics smuggling from Venezuela to the United States and its kidnapping of U.S. citizens in Venezuela to swap for a Venezuelan prisoner incarcerated in the United States.

The Cartel and the Individual Defaulting Defendants committed acts of international terrorism through the provision of material support to Maduro by means of narco-terrorist sales of cocaine in the United States. *See Alban Osio,* 2023WL 5019877, at *5 (explaining that the "kidnapping, torture and murder [of another of Maduro's victims] occurred pursuant to a narco-terrorism terrorism conspiracy designed to flood Florida with cocaine"). Narco-terrorism is an act dangerous to human life, including the lives of U.S. victims of cocaine-related deaths and injuries. Narco-terrorism also violates federal and state laws against drug trafficking. *See* 21 U.S.C. § 960a. And, given Maduro's pattern of hostage taking, the Cartel and the Individual Defaulting

Defendants were aware that funding Maduro would support him in taking U.S.-citizen hostages, meaning that their conduct violated 18 U.S.C. § 2339A's federal prohibition on providing material support or resources, knowing or intending that the funds will be used for hostage taking in violation of 18 U.S.C. § 1203.

The narco-terrorism and accompanying funding of Maduro appeared intended to intimidate or coerce the U.S. civilian population, because, as the U.S. government has explained, "Maduro . . . expressly intended to flood the United States with cocaine in order to undermine the health and wellbeing of our nation." Compl. ¶ 58. The same conduct appears intended to influence the conduct of the U.S. Government, e.g., to support Maduro's kidnapping of U.S. citizens and influence U.S. policy by harming U.S. citizens. As described above, this conduct transcends national boundaries. *See Marron*, 2023 WL 357592, at *3.

The Defaulting Defendants' acts of international terrorism proximately caused Plaintiffs' injuries. Maduro's kidnapping and torture directly caused the injuries suffered by the Plaintiffs and their families, and the Cartel and Individual Defaulting Defendants' provision of material support and narcotics proceeds to Maduro gave rise to the subsequent acts of terrorism they funded, including the kidnapping and torture of Mr. Kenemore, Mr. Marval, and Mr. Saad. *See Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592, 597 (D.C. Cir. 2026) ("on the direct liability claims . . . plaintiffs adequately pleaded that defendants' payments to [the terrorist attacker] proximately caused plaintiffs' injuries"); *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 691–700 (7th Cir. 2008) (same); *Marron*, 2023 WL 357592, at *3 ("Defendants' violations . . . [in] using narcotics sales in Florida to fund their acts of terrorism at home . . . gave rise to Mr. Marron's injuries").

Accordingly, each Defaulting Defendant is liable to the Plaintiffs under the ATA.

11

**F.   Liability Under the Florida Anti-Terrorism Act (Fla. Stat. § 772.13)**

For the same reasons the Complaint establishes a violation of the federal ATA, it establishes a violation of the Florida Anti-Terrorism Act, which authorizes suit by a person injured by an act of terrorism as defined in Fla. Stat. § 775.30. *See Marron*, 2023 WL 357592, at *3. The Defaulting Defendants are therefore liable under the Florida ATA.

**G.   Liability Under RICO (18 U.S.C. §§ 1962(c), 1964(c))**

To establish a civil RICO claim, a plaintiff must show that the defendant (1) conducted or participated in the conduct (2) of an enterprise (3) through a pattern of racketeering activity. 18 U.S.C. §§ 1962(c), 1964(c); *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1311 (11th Cir. 2000). A plaintiff must further allege that the unlawful racketeering activity cause injury to plaintiff's business or property. *Walgreen Co. v. Premier Prod. of Am., Inc.*, 2012 WL 527169, at *3 (M.D. Fla. Feb. 17, 2012).

**i.   The RICO Enterprise**

The Maduro RICO Enterprise is an association-in-fact enterprise, which need not have any structural features beyond "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Here, the Maduro Criminal Enterprise has functioned for many years to achieve the common purpose of supporting Maduro's authoritarian control over Venezuela by engaging in narcotics trafficking acts of terrorism, human rights violations, and public corruption offenses. The kidnappings of Mr. Kenemore, Mr. Marval and Mr. Saad are just one example of the many crimes that the Maduro RICO Enterprise's leaders, through its agents, committed in order to support Maduro's dictatorial rule over Venezuela, which in turn allowed the Maduro Criminal Conspiracy to earn ill-gotten gains with Maduro's support. The Maduro RICO

Enterprise thus has a common purpose, relationships among its associates who are committed to that purpose, and sufficient longevity to pursue its purpose.

### ii.    Conduction of the Affairs of the Enterprise

"[T]o conduct or participate, directly or indirectly, in the conduct of such [an] enterprise's affairs," as required under 18 U.S.C. § 1962(c), "one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). Here, the Defaulting Defendants have admitted by defaulting that they are leaders of the Maduro RICO Enterprise and therefore are liable for conducting the affairs of the enterprise. Compl. ¶¶ 255-256. Further, based on the undisputed facts set forth in the complaint, the Defaulting Defendants have direct involvement in the Maduro Criminal Enterprise's illegal activities. This includes the kidnapping of Mr. Kenemore, Mr. Marval and Mr. Saad, who were snatched and tortured at the hands of government agents acting at the behest of Maduro. Accordingly, the Defaulting Defendants are  liable for conducting the affairs of the RICO enterprise.

### iii.    The Pattern of Racketeering Activity

"[T]he heart of any RICO complaint is the allegation of a *pattern* of racketeering." *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 154 (1987). To show a pattern of racketeering activity, the plaintiff must plead that the defendant engaged in two or more predicate RICO offenses. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989). The offense must be related, that is, they must have "similar purposes, results, participants, victims, or methods of commission . . . ." *Id.* at 240. Third, the pattern must reflect a threat of continuing racketeering activity, which may be established by showing that the predicate acts or offense are part of an ongoing entity's regular way of doing business. *Id.*

Here, the Maduro Criminal Enterprise committed myriad predicate offenses through its drug trafficking and kidnapping actions in and against the United States and its citizens. The following RICO predicate acts are related to one another because they were committed by the same group of actors (Maduro, the Cartel of the Suns, the Individual Defaulting Defendants) and have the same purposes: to raise revenue through drug-trafficking abroad, to kidnap U.S. citizens to protect members of the Maduro Criminal Enterprise, and to reinforce Maduro's authoritarian control over Venezuela. Plaintiffs have demonstrated through the well-pleaded factual allegations of the Complaint that the following acts occurred over a substantial period of time and present a risk of continuing conduct.

RICO predicates include "any offense involving . . . the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance." 18 U.S.C. § 1961(1)(d). Plaintiffs have pleaded sufficient factual allegations to establish that the Defaulting Defendants engaged in a conspiracy to commit narco-terrorism against the United States and import cocaine into the United States. Maduro has in fact been indicted in the U.S. for a narco-terrorism conspiracy in violation of 21 U.S.C. § 960a (knowing or intending to provide, directly or indirectly, anything of pecuniary value to any person or organization that has engaged or engages in terrorist activity). Maduro has also been indicted for offenses involving "the felonious manufacture, importation, receiving . . . or otherwise dealing in a controlled substance," including importing cocaine into the U.S. from abroad in violation of 21 U.S.C. § 952(a) (importing controlled substances in schedule I or II and narcotic drugs in schedule III, IV or V). Compl. ¶ 20. Individual Defaulting Defendants Cabello Rondon was charged with the same narco-terrorism conspiracy as Maduro, *id.* ¶ 28, and Individual Defaulting Defendants Padrino Lopez and Reverol Torres were similarly charged with cocaine trafficking. *Id.* ¶¶ 24, 26.

14

RICO predicates include any act that is indictable under any provision listed in 18 U.S.C. § 2332b(g)(5)(B), which, in turn, lists violations of 18 U.S.C. § 2339A (providing funds knowing that the monies will support hostage taking) and 18 U.S.C. § 2339C (prohibiting financing of terrorism). Here, Plaintiffs have pleaded sufficient factual allegations to establish that the Maduro Criminal Enterprise violated this section by knowingly selling narcotics in Florida and providing proceeds to Maduro, knowing that he engages in a pattern of terrorist kidnappings of U.S. citizens.

RICO predicates include "any act or threat involving . . . kidnapping . . . which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961. Here, the conspiracy to kidnap Mr. Kenemore, Mr. Marval, and Mr. Saad, in which the Defaulting Defendants engaged, is chargeable under Florida law and punishable for more than a year. Overt acts in furtherance of the kidnapping occurred in Florida, in that the object of the kidnapping was to obtain the release of Defaulting Defendant and co-conspirator Alex Saab, who was incarcerated in Florida at the time.

### iv.      Injury to business or property due to RICO violations

Finally, the Complaint plausibly alleges that the Maduro Criminal Enterprise's RICO offenses were the proximate cause of injury to Plaintiffs' business and property. The Defaulting Defendants stole money from Mr. Marval's bank accounts by taking his cell phone and forcing him to reveal passwords so that they could access his accounts. Mr. Marval owned a variety of businesses that suffered economic losses because Mr. Marval was not available to operate them while he was in captivity. *See Diaz v. Gates,* 420 F.3d 897, 905 (9th Cir. 2005) (Kleinfeld, J., concurring) (where "a person whom a business needs to function is murdered," the resulting injury to business is compensable through civil RICO claim). Similarly, the kidnapping of Mr. Saad resulted in the loss of his jewelry business. Finally, the Defaulting Defendants are responsible for

the theft of Mr. Kenemore, Mr. Saad, and Mr. Marval's personal property when they were kidnapped and for the expenses that their relatives incurred in trying to obtain their release. *See Geraci v. Women's All., Inc.*, 436 F. Supp. 2d 1022, 1039 (D.N.D. 2006) (out-of-pocket expenses and legal fees incurred as the result of kidnapping recoverable under RICO).

### DAMAGES

#### A.   ATA Damages

After entering default judgment on liability, a court must determine the amount of damages to be awarded. *See Holtz v. Bagel Mkt., Inc.*, No. 12-620402013 WL 12141515, at *2 (S.D. Fla. Apr. 29, 2013). Courts considering the ATA have held that its purposes are best achieved if the ATA is interpreted to subject terrorists to the broadest range of damages. *See Knox v. Palestinian Liberation Org.*, 442 F. Supp. 2d 62 (S.D.N.Y. 2006). The same is true under the Florida ATA. *Alban Osio*, 2023 WL 5019877, at *10.

Under the egregious circumstances of this case, and consistent with the well-established per-diem framework for hostages and kidnapping victims, as adjusted for inflation, and with the additional lump-sum awards courts grant where captivity is aggravated by torture, the Court finds the following compensatory awards reasonable and supported by the record and by comparable awards. *See, e.g., Marron*, 2023 WL 357592, at *3 (S.D. Fla. Jan. 23, 2023) (employing an inflation adjusted $18,164 per day in 2023 dollars for kidnapping and torture by the Maduro regime, resulting in an ATA damages award for Mr. Marron of $77,843,976 for kidnapping and torture, after trebling). This formula was first introduced in 1998, and adjusted for inflation through 2026, comes to $20,127 in today's dollars.

The kidnapping-and-torture awards to Mr. Kenemore, Mr. Saad, and Mr. Marval reflect a per-diem component for each day of captivity together with a lump sum for the torture each

16

endured. Solatium and emotional-distress damages are awarded to the immediate family members of Mr. Kenemore and Mr. Marval in the amounts set forth below.

The Court awards ATA compensatory and trebled damages as follows:

| Plaintiff | Injury | Compensatory Damages | Trebled Damages |
|---|---|---|---|
| Jerrel Kenemore | Kidnapping and torture | $20,441,661 | $61,324,983 |
| Rejeana Ann Tillery (Sister) | Solatium, pain and suffering | $2,500,000 | $7,500,000 |
| Tina Rachel Porras (Sister) | Solatium, pain and suffering | $2,500,000 | $7,500,000 |
| Jerrel L. Kenemore II (Son) | Solatium, pain and suffering | $5,000,000 | $15,000,000 |
| Tristan A.L. Kenemore (Son) | Solatium, pain and suffering | $5,000,000 | $15,000,000 |
| Zoe A.V.L. Kenemore (Daughter) | Solatium, pain and suffering | $5,000,000 | $15,000,000 |
| Jason Saad | Kidnapping and torture | $18,771,120 | $56,313,360 |
| Edgar Jose Marval | Kidnapping and torture | $19,975,621 | $59,926,863 |
| Lady S.S. Morris (Wife) | Solatium, pain and suffering | $15,000,000 | $45,000,000 |
| S.M.S. (Minor child) | Solatium, pain and suffering | $5,000,000 | $15,000,000 |
| M.S.M. (Minor child) | Solatium, pain and suffering | $5,000,000 | $15,000,000 |
| | | **TOTAL ATA (Trebled)** | **$312,565,206** |

The total ATA damages, after trebling, are **$312,565,206.00**.

**B.   RICO Damages**

The Court finds Mr. Marval's request for RICO damages of $500,000 for the theft of his life savings and damages to his businesses, trebled to $1,500,000 pursuant to 18 U.S.C. § 1964(c),

to be reasonable and awards him that amount. The Court further awards Mr. Kenemore and Mr. Saad nominal RICO damages of $1.00 each.

### C.   Attorneys' Fees and Costs

Plaintiffs are entitled to reasonable attorneys' fees and costs under 18 U.S.C. § 2333(a) and 18 U.S.C. § 1964(c), in an amount to be determined upon separate motion.

### D.   Total Award

The Court finds that the Defaulting Defendants are jointly and severally liable to Plaintiffs in the total amount of **$314,065,208.00**, comprising $312,565,206.00 in trebled ATA damages, $1,500,000.00 in trebled RICO damages awarded to Mr. Marval, and $2.00 in nominal RICO damages awarded to Mr. Kenemore and Mr. Saad, together with prejudgment interest, attorneys' fees, and costs.

Based on the foregoing findings of fact and conclusions of law, it is hereby **ORDERED AND ADJUDGED** as follows:

1.  Plaintiffs' Motion for Final Default Judgment as to the Individual Defaulting Defendants and the Cartel of the Suns, [ECF No. 30], is **GRANTED**.

2.  Final Default Judgment shall be entered in favor of Plaintiffs and against Defendants Nicolas Maduro Moros, The Cartel of the Suns a/k/a Cartel de los Soles, Vladimir Padrino Lopez, Maikel Jose Moreno Perez, Nestor Luis Reverol Torres, Tarek William Saab, Diosdado Cabello Rondón, and Alex Nain Saab Moran, jointly and severally, in the total amount of **$314,065,208.00**, together with prejudgment interest, attorneys' fees, and costs.

3.  The damages awarded to each Plaintiff are as set forth in the tables and paragraphs above, and are incorporated herein by reference, and shall accrue interest at the maximum statutory rate.

4.  Plaintiffs are entitled to recover their reasonable attorneys' fees and costs.

5.  The Court retains jurisdiction to enforce this Order and the Final Judgment, to determine attorneys' fees, costs, and prejudgment interest, and to adjudicate the remaining claims against the Non-Defaulting Defendants.

6.  Pursuant to Federal Rule of Civil Procedure 58, the Court will enter a separate Final Judgment consistent with this Order.

7.  Let execution issue forthwith.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 14th day of July, 2026.

**DARRIN P. GAYLES**
**UNITED STATES DISTRICT JUDGE**